USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1828 UNITED STATES OF AMERICA, Appellant, v. REX W. CUNNINGHAM, JR., THOMAS FERRIS, BRIAN HOYLE, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, _____________________ and Lynch, Circuit Judge. _____________ ____________________ Todd E. Newhouse, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. Wendy Sibbison for appellees. ______________ ____________________ May 19, 1997 ____________________ BOUDIN, Circuit Judge. In the district court, the ______________ defendants in this criminal case moved to suppress evidence as illegally seized and, based on the magistrate judge's report, the district court granted the motion. The government filed an interlocutory appeal from the suppression order. We reverse. I. In late February 1992, Carmen Picknally, an assistant district attorney in Hampden County, Massachusetts, applied to the state Superior Court for a warrant, pursuant to Mass. Gen. Laws ch. 272, 99(F), to authorize the interception of telephone calls to or from two specified cellular car telephone numbers. The car telephones in question were located in cars controlled by defendant Rex W. Cunningham, Jr., and the offenses under investigation were suspected violations of state anti-gambling statutes. Mass. Gen. Laws ch. 271, 17. A supporting 109-page affidavit by state trooper Timothy Alben described evidence that Cunningham had used threats in attempting to collect gambling debts for bets that he had taken. The affidavit also set forth information from five confidential informants about a large-scale gambling organization allegedly controlled by Cunningham, including specifics as to how the organization worked, the names of -2- -2- employees, telephone numbers, and the location of records and cash. On February 28, 1992, Justice Constance Sweeney, of the state Superior Court, issued the requested warrant, and signed ancillary orders directed to two carriers. Several incriminating calls were intercepted between Cunningham and others and were described in another affidavit of Alben in support of a requested extension sought by Picknally on or about March 17, 1992. Justice Sweeney granted the requested extension. Surveillance of the two telephones ended on April 1, 1992. On April 17, 1992, Picknally applied to the Superior Court for a new warrant, this time (according to the application's caption) "authorizing the interception of oral communications of . . . Cunningham within an establishment known as Dillons (sic) Tavern." The application identified Dillon's Tavern at a street address in Springfield, Massachusetts, and said that it was on property controlled by Cunningham and his relatives. Incorporating a new Alben affidavit, the application referred to loansharking, Mass. Gen. Laws ch. 271, 49, as well as gambling, as suspected offenses. Although the caption referred to interception of oral communications "within . . . Dillons (sic) Tavern," the first paragraph described the application as one for a -3- -3- warrant "to intercept certain wire and oral communications," and there are later references to "wiretaps" and, separately, to "oral communications . . . within Dillons (sic) Tavern." The affidavit also asked for authority for Alben to make secret entries into Dillon's Tavern "for the purpose of installation and activation of oral interception devices." This application, it appears, was a poorly edited markup of the original wiretap application. Immediately below Picknally's signature was a paragraph signed by the district attorney for the county, saying that he had reviewed the application and affidavit and that the proposed use of electronic surveillance relative to two specified telephone numbers was consistent with county policy. The two listed telephone numbers were the cellular telephone numbers specified in the original application. Apparently the paragraph had been copied from the original warrant application without change.  The supporting Alben affidavit, this time 62 pages in length but attaching the original affidavit as well, described Cunningham's caution in using the telephone and provided reasons for believing that Cunningham and others were using Dillon's Tavern for meetings in aid of gambling and loansharking. The affidavit described Cunningham's regular use of a particular table in Dillon's Tavern to -4- -4- conduct his business. It also explained why oral interceptions were needed to supplement other evidence. Alben's affidavit did not contain the confusing jumble of references to wiretaps and oral communications that marred the Picknally application. It asked for approval to intercept oral communications within Dillon's Tavern, specifying that interception would be limited to only such times that physical ____ surveillances of this DILLONS TAVERN and Rex W. CUNNINGHAM Jr. can reasonable (sic) place CUNNINGHAM within this location and that interceptions will take place only at or near the particular table within the dining area which has been identified within this affidavit as being consistently used by CUNNINGHAM or his associates. It also asked approval to enter Dillon's Tavern to install technical equipment to achieve the interceptions. The warrant signed by Justice Sweeney had a caption similar to the application, specifically referring to interception of oral communications; but--like the application--the warrant also referred confusingly to wire communications. It approved the secret entry to install equipment, and imposed various safeguards. The warrant was extended numerous times, and assault and battery was added as a suspected offense. Surveillance ended on November 1, 1992. By then 125 cassette tapes had been accumulated and were sealed by the Superior Court. On April 21, 1995, a federal grand jury in Springfield indicted Cunningham on RICO violations, loansharking, illegal -5- -5- gambling activities, and conspiracy to commit those offenses, 18 U.S.C. 2, 892, 894, 1955, and 1962(c) and (d). Co- defendants Brian Hoyle and Thomas Ferris were charged with loansharking conspiracy. Most of the evidence against Cunningham, and all of the evidence against the co- defendants, derived from the electronic surveillance and from searches conducted under state-court issued warrants at various sites shortly before the surveillance terminated. By joint motion filed on December 15, 1995, the defendants moved to suppress materials acquired by electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2510-20. That statute governs interception of both wire communication and oral communication, laying down detailed standards and procedures. Id. 2516-18. It also provides for exclusion from ___ evidence of interceptions taken in violation of the statute. Id. 2515. ___ After a two-day evidentiary hearing, including testimony from Picknally, Alben, and Hampden County District Attorney William Bennett, the magistrate judge issued a report on March 28, 1996. In it, he recommended that the motion to suppress be allowed as to all electronic interceptions of conversations at Dillon's Tavern. He said that the confusion in the warrant meant that it did not comply with statutory requirements as to specificity, 18 U.S.C. 2518(4), nor-- -6- -6- assuming a good faith exception existed--was reliance on the warrant objectively reasonable. On May 17, 1996, the district court approved the magistrate judge's recommendation. Its analysis tracked that of the magistrate judge and his rejection of a "good faith" defense was adopted by cross reference. In memoranda dated June 13 and July 12, 1996, the district court addressed two successive government motions for reconsideration but stood by its earlier conclusion. The government then brought the case to us by interlocutory appeal. 18 U.S.C. 3731. II. On review of a suppression order, we defer to the factfinder's findings of raw fact unless clearly erroneous, and we consider issues of law de novo. United States v. _______ ______________ Morris, 977 F.2d 677, 680 (1st Cir. 1992). In the past, ______ there has been deference accorded to the factfinder's judgment in applying general standards to particular known facts; but the Supreme Court has recently stressed our responsibility, in a related Fourth Amendment context, to review "mixed questions" from an independent vantage. Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996) _______ _____________ (reasonable suspicion and probable cause). The government offers two alternative reasons for reversal. The first is its claim that the warrant adequately, although not perfectly, identified oral -7- -7- communications as its target--especially since Justice Sweeney and Trooper Alben as executing officer knew that this was its purpose. The second argument is that the so-called good-faith exception of United States v. Leon, 468 U.S. 897 _____________ ____ (1984), is available under the statute in this case and applies on the present facts.  At the threshold, defendants object that neither basis for appeal was sufficiently preserved. Because we consider only the first ground on the merits, our discussion of this threshold objection is similarly limited. To decipher that objection, it is necessary to understand how the government's defense of its warrant evolved on the path from the magistrate judge to the district court and finally to us. Before the magistrate judge, the government defended its warrant on the ground that, analyzing the wording in detail, the errors were technical or clerical. The government did not expressly assert that the personal knowledge of the authorizing judge and executing officer were pertinent; but, the magistrate judge touched obliquely on the issue, saying that the government's "excuse" would, if accepted, "allow agents to conduct searches so long as they understood what ____ was intended by the orders which their attorneys drafted for _____ signatures by the court." In its district court brief, the government again analyzed the warrant's language, arguing that it referred -8- -8- several times to interception of oral communications at Dillon's Tavern and that no reasonable officer would read it to approve wiretaps, especially because no telephone numbers were listed in the warrant. The government did not mention the knowledge of the judge or executing officer; indeed, in its first petition for reconsideration, the government complained that the district court had looked "beyond the four corners of the warrant." The government's first attempt to emphasize what Justice Sweeney and Trooper Alben knew at the time came only in its appellate brief where, for the first time, it also cited to United States v. Bonner, 808 F.2d 864 (1st Cir. 1986), and ______________ ______ similar cases making such knowledge relevant. Whether this new emphasis is a separate "ground" or merely a new twist, the government clearly did not offer it below and instead steered the magistrate judge and district court toward a strict linguistic analysis of the warrant. If these judges erred, it was surely error "invited" by counsel. But whether we should ignore Bonner is a more difficult ______ question. The government sought timely review of the magistrate judge's ruling, and it filed a timely appeal to us from the district court's ruling. True, local rules warn that failing to list grounds for reviewing the magistrate -9- -9- judge's report may be fatal;1 but we do not read this warning to counsel as preventing a reviewing court--where timely review is sought at each stage--from noticing on its own arguments not developed below. The ability of a reviewing court to decide the case properly is fundamental. Singleton v. Wulff, 420 U.S. 106, _________ _____ 120-21 (1976). Indeed, the rules expressly preserve our ability to notice "plain errors" that affect "substantial rights," Fed. R. Crim. P. 52(b), especially where failure to do so would work a substantial injustice. United States v. ______________ Olano, 507 U.S. 725 (1993); see also Johnson v. United _____ _________ _______ ______ States, ___ S. Ct. ___, 1997 WL 235136 (U.S. May 12, 1997). ______ The threat of substantial injustice is not limited to the interests of defendants. United States v. Krynicki, 689 F.2d _____________ ________ 289, 292 (1st Cir. 1982).  In this case, Bonner and similar decisions show that the ______ issue of knowledge is not wholly distinct from the claim of clerical error; whether an error is forgiven as clerical depends, at least in some situations, on whether in context it actually threatened privacy interests; and this in turn may be affected by the executing officers' knowledge. The  ____________________ 1Compare Rule 3(b), Rules for U.S. Magistrates in U.S. _______ District Court in Massachusetts with Thomas v. Arn, 474 U.S. ____ ______ ___ 140, 146 & n.4 (1985) (declining to treat such rules as jurisdictional). See generally 15A C. Wright, et al., ______________ Federal Practice andProcedure 3901.1, at 42 (2d ed. 1992).  _____________________________ -10- -10- Bonner argument is not intuitively evident; but it is "plain" ______ enough once the cases are consulted.  A final reason for refusing to cabin the analysis here is that the defendants are not prejudiced, because their ability to meet the government's Bonner argument is not ______ affected by the delay. The knowledge of the state judge and executing officer is readily inferred from documents and from testimony taken at the magistrate judge hearing, where defense counsel cross-examined the witnesses. Defendants have not pointed to any evidence lost or foregone due to the government's tardiness in making its knowledge argument.  III. Turning then to the merits, we face at the outset a statutory ban on use in court of the contents of an intercepted wire or oral communication, or "evidence derived therefrom," where disclosure would violate Title III. 18 U.S.C. 2515. There is no violation if the interception was "authorized by" Title III. Id. 2517. The authorizing ___ provisions, 18 U.S.C. 2516-18, elaborately set forth the crimes to be investigated, the application process for authorizing orders, and the standards to be met. Pertinent here is 18 U.S.C. 2518(4), which governs each order authorizing an interception and requires that the order specify five different items. Three items (subsections (a), (d) and (e)) are not in dispute: the identity of the -11- -11- target, the identity of the agency and the authorizing official, and the time period. The other two items which must be included are as follows: (b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted; [and] (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates[.] The defendants invoked both provisions; the magistrate judge and the district judge focused upon (b), as the government seeks to do here. In truth, we think that both provisions need to be read together. Their thrust, disregarding the final clause of (c), is to identify the type of communication and to narrow the targeted communications by location of "facilities" (e.g., identifying a particular ____ telephone) or "place" (e.g., where a "bug" is to be located ____ to intercept oral communications). In a literal sense, the warrant does describe both type and place: it refers expressly to oral communications and to Dillon's Tavern. But this is an extreme example of missing the forest for the trees. By referring randomly to oral communications and wire communications or wiretaps, the warrant is garbled on the very questions posed by subsections (b) and (c). Taken as a whole--but taken alone and without extrinsic evidence--the warrant does not tell the objective -12- -12- but ignorant reader just what interceptions are to be targeted. Now, the extent of confusion is a matter of degree. Any reader can see that the warrant has been misdrafted; whether a reasonable (but otherwise uninformed) police officer would solve the puzzle correctly is probably a matter of percentages. In all events, the confusion is serious, and despite the government's linguistic acrobatics, this is not a warrant that we would deem adequate if it were signed by a judge and executed by a police officer having no other knowledge of the background and objectives.  The inadequacy is not because of any high likelihood that an otherwise uninformed officer would tap a telephone or would intercept Cunningham's oral communications at some other location than Dillon's. No telephone number is given in the body of the warrant, and no other "place" of interception is mentioned. Rather, standing alone, the bare inconsistent words of the warrant fail to create reasonable assurance that the signer or reader would know just what was intended. But this is not the end of the story. The Supreme Court has made clear that suppression is not automatically required for every Title III violation; rather, as a sister circuit summed up the Supreme Court's precedents in United States v. ______________ Johnson, 696 F.2d 115, 121 (D.C. Cir. 1982), "violations of _______ -13- -13- even . . . central requirements do not mandate suppression if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." See also United States v. Donovan, 429 U.S. 413, ________ _____________ _______ 433-34 (1977); United States v. Chavez, 416 U.S. 562, 574-75 _____________ ______ (1974). Title III is designed to protect privacy interests similar to those reflected in the Fourth Amendment. Whether or not Leon's good faith exception should be interpolated ____ into the statute--an issue we do not decide--Fourth Amendment precedent is highly relevant in deciding whether an authorizing order is valid and whether a defect in wording is of a kind that threatens the central interests sought to be protected. Indeed, the Supreme Court itself has relied upon Fourth Amendment precedent in implementing Title III. Dalia _____ v. United States, 441 U.S. 238, 254-59 (1979). _____________ A substantial body of Fourth Amendment precedent akin to Bonner, representing most circuits, permits a reviewing court ______ to consider the knowledge of the officials who approved the warrant and executed it. The reason is fairly straightforward: such knowledge may, on particular facts, show that there was in fact no real threat to legitimate ________ privacy interests. Examples include the judge approving the -14- -14- warrant but forgetting to sign, or the warrant's omission of an address known both to the judge and executing officer.2 In calling such mistakes "clerical," courts do not mean that they are all unimportant typographical errors. What is meant is that they are wording mistakes introduced by accident or lack of care rather than wilfully or with a sinister purpose. Cases like Bonner often involve, and ______ forgive, very serious clerical mistakes, depending upon the risk that they posed in fact. E.g., Bentley, 825 F.2d at ____ _______ 1109 (personal knowledge of officers saved warrant that listed wrong office number). In this sense, the term "clerical" is highly misleading. Such an approach is not cost free. In an individual case, a defect may pose no threat (we will show that this is so here); but exclusion of evidence in that case will still make the police more careful next time and so may prevent a different mistake that does pose such a threat. But there are costs either way: excluding reliable evidence and possibly freeing the guilty is also a cost. And cases like  ____________________ 2See, e.g., United States v. Brown, 49 F.3d 1162, 1168- _________ ______________ _____ 69 (6th Cir.), cert. denied, 116 S. Ct. 377 (1995); United ____________ ______ States v. Owens, 848 F.2d 462, 465 (4th Cir. 1988); United ______ _____ ______ States v. Bentley, 825 F.2d 1104, 1109 (7th Cir.), cert. ______ _______ _____ denied, 484 U.S. 901 (1987); United States v. Turner, 770 ______ _____________ ______ F.2d 1508, 1511 (9th Cir. 1985). An extensive collection of federal cases, by circuit, is contained in 84 Geo. L.J. 717, _________ 734 n.78 (1996). Some additional case authority, including state cases, is contained in 2 LaFave, Search and Seizure  ___________________ 4.5(a) (3d ed. 1996). -15- -15- Bonner represent a balance between competing objectives. In ______ any event, such is the law of this circuit and many others. In sustaining the warrant in this case, we rely upon two major elements. First, the flaw in this case, although serious, was a discrete set of clerical mistakes in a process that in all other important respects complied with the statute. An application to a judge was made; it demonstrated probable cause and other requisites for the interceptions proposed; it identified place and type (although in a confusing language); a warrant was signed; and the authorizing judge and executing officer knew just what they were doing.  Second, because the judge and the executing officer knew _______ what had been proposed and authorized, there was no substantial threat that this officer would intercept communications other than as authorized. Thus, despite the seriously confusing language, the error here presented far less of a threat to civil liberties than, say, a facially coherent warrant that mistakenly inverted the numbers of a street address and was executed by an officer who did not know the actual address.  It is the combination of these two elements that, as in Bonner, persuades us that the warrant should be treated as ______ valid and, as in Johnson, that "the statutory purpose [of _______ Title III] has been achieved despite the violation." 696 -16- -16- F.2d at 121. And, as always, substantial compliance and risk from error are matters of degree. Knowledge would not save the interception if, for example, Alben had made out the affidavit but then neglected to present it to a judge to secure judicial approval. Similarly, nothing in what we say offers any comfort to an officer who fails to comply with the true object of the warrant. It is also worth stressing that the knowledge of Justice Sweeney and of Trooper Alben are established by a paper-trail record that was created before the search. The affidavits ______ submitted to secure the telephone taps and then to authorize oral interceptions show beyond serious dispute just what the judge and the executing officer understood. The hearing record before the magistrate judge does help knit the events together, but there is no threat here of recollections being invented after the event. This hard evidence lessens, although it does not eliminate, the problems associated with any resort to personal knowledge. But proof of the knowledge possessed by the police is the critical issue for most warrantless arrests ____ and searches, e.g., Chambers v. Maroney, 399 U.S. 42, 47-48 ____ ________ _______ (1970); and, of course, knowledge is scrutinized in warrant cases as well where (for example) there is a charge of fabrication or of invented information. -17- -17- The Supreme Court's cases do express a special concern where subjective motivation rather than knowledge is __________ _________ involved. Thus, the Court has held as a matter of law that malignant motive is irrelevant where objectively reasonable conduct is proved to make out a defense of governmental qualified immunity, Anderson v. Creighton, 483 U.S. 635, 641 ________ _________ (1987), or where probable cause exists but a search is challenged as pretext. Whren v. United States, 116 S. Ct. _____ _____________ 1769, 1774 (1996). But the special concerns about overturning reasonable conduct because of bad motive have nothing to do with this case.  One final word on this issue is in order. Where, as here, the government seeks to rescue a defective warrant based partly on knowledge of the judge or officer, the burden is upon it to prove such knowledge--just as it would be the defendant's burden if the warrant were facially valid but sought to be impugned by proof of perjury. It is fortunate for the government that in this case, the evidence is overwhelming and available from the existing record. This piece of luck does not make the mishandling of the matter look any more attractive. IV. The defendants advance an alternative ground for upholding the suppression of the Dillon's Tavern tapes. They claim that the government failed to comply with the sealing -18- -18- requirement of Title III, 18 U.S.C. 2518(8)(a), with respect to the cellular phone tapes. And, since the Dillon's Tavern surveillance derived from this allegedly tainted ____ evidence, defendants say that it must be suppressed. Id.  ___ 2515. The district court ruled that the brief delay in sealing was not material. The statute authorizing an interlocutory appeal from an order of suppression, 18 U.S.C. 3731, gives only the government a right to appeal, and for good reason. If evidence is suppressed, the government cannot appeal the suppression order after trial for double jeopardy reasons, whereas the defendant (if convicted) can always appeal from the district court's earlier refusal to suppress. It is well-established that appellate courts can uphold a judgment based on a ground rejected by the district court. This general principle has been applied to section 3731 appeals. United States v. Moody, 485 F.2d 531, 534 (3d Cir. _____________ _____ 1973). But the government objects in this case that the defendants' alternative ground would not only support the order suppressing the Dillon's Tavern tapes but also undermine the different order declining to suppress the cellular phone tapes. Thus, it argues that the alternative ground is really a Trojan-horse effort to review an unappealable order. -19- -19- The argument is clever but unpersuasive. The fact that the sealing issue may have implications for two different orders does not prevent us from considering that issue so far as it pertains to a reviewable order. The cases cited by the government, e.g., United States v. Shameizadeh, 41 F.3d ____ _____________ ___________ 266, 267 (6th Cir. 1994), are not on point. Indeed, if we  thought that the suppression order were clearly valid, but on a ground different than that offered by the district court, it would be bizarre to overturn it. In this instance, however, the magistrate judge and the district court amply justified their action in treating the brief sealing delay as "satisfactor[ily] explained." 18 U.S.C. 2518(8)(a). See United States v. Ojeda Rios, 495 __________________ __________ U.S. 257, 265 (1990). There was no bad faith by the police, no claim of alteration to the tapes, and no other prejudice even suggested. Given these circumstances and the brevity of the delay, we think no extended discussion is required in this case.  Reversed.  _________ -20- -20-