UNITED STATES of America, Plaintiff,

v.

Patricia BORCH, Defendant.

No. 88–CR–20022–03–BC.

United States District Court,
E.D. Michigan, N.D.

Sept. 2, 1988.

Michael J. Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., for plaintiff.

Henry J. Sefcovic, Bay City, Mich., for defendant.

## MEMORANDUM OPINION

CHURCHILL, District Judge.

In this criminal proceeding, Defendant Patricia Borch has filed a suppression motion that requires the Court to consider the scope of "wire communications" within the meaning of 18 U.S.C. § 2510(1). Because the Court finds that non-telephonic conversations transmitted over an inadvertently open phone line do not fall within the ambit of "wire communications," the Court shall grant Defendant Borch's suppression motion.

### I. The Factual Setting

On March 2, 1988, the Court entered an order authorizing interception of wire communications concerning an alleged conspiracy to distribute various controlled substances. *Cf.* 18 U.S.C. § 2516. The Court's authorization order, which specifically named Patricia Borch as one of the targets, afforded the Federal Bureau of Investigation the power "to intercept wire communications" of Defendant Borch. For purposes of this motion, Defendant Borch concedes that the authorization was granted in permissible fashion.

Acting upon the authority granted by the Court, FBI agents undertook an extensive program of telephone call interception. One of the calls that the agents monitored involved discussion between Borch and an individual known as "Boomer." At the conclusion of this call, which occurred at approximately 5:40 p.m. on March 30, 1988, Defendant Borch hung up her receiver, but she did not do so as effectively as she intended. In the ensuing moments, as evidenced by the tape played in open court, her telephone emitted the ordinary litany of a dial tone, then a recording stating that the phone was off the hook, and then systematic beeping. Ultimately, however, the noises ceased, leaving a silent, open line into Defendant Borch's kitchen.[1]

Based on the simple fact that Defendant Borch's phone was not properly placed in its cradle, the monitoring process automatically continued after Borch ended her conversation with "Boomer." Although the agent monitoring the interception made periodic inspections for purposes of minimization, interception continued for more than two hours after completion of the actual phone call. During this "non-call" period of interception, Defendant Borch made several inculpatory statements that were picked up by her kitchen phone and consequently recorded by the FBI's interception equipment. The line was not broken until Dennis Todd arrived at Borch's house at 8:00 p.m. After a short colloquy between Todd and Borch, the tape reveals that the two collectively ascertained that the phone was off the hook. When Dennis Todd finally hung the phone up properly, the inculpatory "non-call" conversation within "Call 476" was well-secured in FBI recording equipment. It is this information that

---

1. As an alternative argument, Defendant Borch asserts that the FBI placed a separate "bug" in her house that picked up the "non-call" statements. The Court finds this contention to be both unsupported and implausible; the tape played in open court clearly demonstrates the manner in which telephonic interception of the "non-call" discussion occurred.

Borch has moved the Court to suppress as beyond the scope of "wire communications."

## II. The Nature of "Wire Communications"

Because "wire communications" are both defined and carefully regulated by statute, the starting point in considering the term's precise meaning necessarily is the relevant statutory language. In Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, Congress described a "wire communication" essentially as an "aural transfer ... between the point of origin and the point of reception...."[2] 18 U.S.C. § 2510(1). An "aural transfer," in turn, is defined as "a transfer containing the human voice at any point between and including the point of origin and the point of reception." *Id.* § 2510(18). Defendant Borch's comments, whether inculpatory or not, clearly "contain the human voice." *See id.* What is not clear, however, is whether the case at bar falls within the requirement of a "transfer ... between the point of origin and the point of reception." *Id.* § 2510(1); *see also id.* § 2510(18).

In cases where intercepted point-to-point telephonic dialogue includes inculpatory statements contained in background discourse, courts have divided on whether such non-telephonic comments made *during* phone calls are "wire communications." *Compare United States v. King*, 335 F.Supp. 523, 548 (S.D.Cal.1971), *remanded in part on other grounds*, 478 F.2d 494 (9th Cir.), *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 94 (1973) (background conversations not "wire communications") *with United States v. Lanza*, 349 F.Supp. 929, 934 (M.D.Fla.1972) (sanctioning interception of background conversations); *see*

*also United States v. Couser*, 732 F.2d 1207, 1208–10 (4th Cir.1984) (characterizing interception of "background conversations involving a person using the phone" as "arguably ... technical violations" of "wire communications" limitation in wiretap application, court counselled against such practice but refused to suppress "in the absence of bad faith conduct on the part of the Government.") (citations omitted). In the Court's view, background comments intercepted in such cases require a significantly less strained interpretation of the term "wire communication" than that urged by the Government in the case at bar. During the course of a phone conversation, all background discussions of sufficient volume are "transferred" from a discrete telephonic "point of origin" to a distinct telephonic "point of reception." *Cf.* 18 U.S.C. § 2510(18). In this respect, individuals offering background comments are well aware that their statements may be transmitted to the receiving end of the telephone line. *Compare* 18 U.S.C. § 2510(1) (defining "wire communication") *with id.* § 2510(2) (defining, and implicitly contrasting, "oral communication"); *see also* S.Rep. No. 1097, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2178 (defining, and briefly discussing, "wire communication" and "oral communication"). Thus, "interception" of *"wire* communications" contemplates surreptitious monitoring activity *within* the channel of transmission.

The case at bar does not involve the interception of background conversation during the course of point-to-point telephonic discussion. Nevertheless, the Government contends that non-telephonic discourse transmitted only as far as the FBI monitoring equipment is of the same

**2.** In its entirety, 18 U.S.C. § 2510(1) states as follows:

"wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in

providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce and such term includes any electronic storage of such communication, but such term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit[.]

nature from a statutory perspective.[3] The Government's position finds limited support in Chief Judge Brieant's opinion in *United States v. Feola*, 651 F.Supp. 1068 (S.D.N.Y. 1987) (Brieant, C.J.). *Feola* involved interception of non-telephonic conversation when one of the wiretap targets removed his phone from the hook "to make an uncompleted outgoing call." *Id.* at 1107. Judge Brieant specifically recognized that such circumstances did not involve the "arguably ... legitimate privacy interest implicated" when a phone is removed from the hook for any purpose other than telephonic communication. *Id.* Moreover, a previously entered *nunc pro tunc* court order had explicitly authorized the type of interception at issue in *Feola*. *See id.* For these reasons, *Feola* is not particularly helpful to the Government in the case at bar.

In a factual context more readily analogous to Defendant Borch's case, the Court of Appeals of New York reached the following legal conclusion:

> A warrant authorizing the tapping of a telephone line permits the monitoring of conversations carried on over the telephone but not the monitoring of conversations carried on within the home in which the telephone is located which become audible to the monitoring officers when the telephone receiver is taken off the hook, not for the purpose of engaging in a telephone conversation but to avoid interruption by incoming calls.

*People v. Basilicato*, 64 N.Y.2d 103, 485 N.Y.S.2d 7, 9, 474 N.E.2d 215, 217 (1984). The defendant seeking suppression in *Basilicato* had face-to-face conversations intercepted when he took his phone off the hook "to avoid interruption by incoming calls." *Id.* at 10, 474 N.E.2d at 218. Interpreting New York law that particularly distinguishes wire communications from oral communications, *see id.* at 11 & n. 1, 474 N.E.2d at 219 & n. 1, (noting that "[a] similar distinction is drawn in the applicable Federal statutes between the interception of 'wire communications' and 'oral communications'") (citation omitted), the *Basilicato* court found the intercepted face-to-face conversations to be beyond the scope of the warrant authorizing "interception of telephonic communication." *Id.* at 11–12, 474 N.E.2d at 219–20 (court offered the Fourth Amendment and New York constitutional and statutory provisions as authority for its ruling). Accordingly, the court suppressed "the resulting evidence." *Id.* at 12, 474 N.E.2d at 220 (citation omitted).

Although *Basilicato* did not involve the federal statutory scheme that controls the case at bar, the *Basilicato* court scrutinized statutory provisions "similar" to the federal scheme and concluded that the interception in question "implicated ... a legitimate privacy interest" not present in the typical background conversation setting. *Feola*, 651 F.Supp. at 1107 (interpreting *Basilicato*); *see also Basilicato*, 485 N.Y.S.2d at 11–12, 474 N.E.2d at 219–20. As *Basilicato* recognizes and *Feola* concedes, there is a fundamental distinction between background discussions during a point-to-point phone call and face-to-face discourse while no point-to-point call is in progress. Only the former category of conversation can be classified as "wire communication" within the meaning of the operative statutory language. The latter category, if monitored, involves wire transmission only to the FBI interception equipment, rather than to a "point of reception." [4] *Cf.* 18 U.S.C. § 2510(1). In light of this distinction, the Court finds that the non-telephonic statements of Defendant Borch included as part of "Call 476" are not "wire communications" within the stat-

---

3. The Court's analysis in the case at bar is limited to application of Title III. Thus, the Court need not address the constitutional implications of the Government's actions. *See, e.g., United States v. Donovan*, 429 U.S. 413, 432 n. 22, 97 S.Ct. 658, 670 n. 22, 50 L.Ed.2d 652 (1977).

4. The statutory requirement of "point of origin" to "point of reception" transmission ostensibly justifies the diminished expectation of privacy in "wire communications" as compared to "oral communications." *Compare* 18 U.S.C. § 2510(1) *with id.* § 2510(2); *see also* J. Carr, The Law of Electronic Surveillence § 5.4(a) (2d ed. 1986) (citing *United States v. Bourgeois*, No. 48456, slip op. at 11 (E.D.Mich. Nov. 1973)).

utory framework underlying the Court's authorization order.[5] A contrary ruling would unjustifiably blur Congress' clear differentiation between "wire communications" and "oral communications." *See* 1968 U.S.Code Cong. & Admin.News at 2178 (discussing 18 U.S.C. §§ 2510(1) & (2)).

### III. The Propriety of Suppression

Based upon the finding that interception of the "non-call" discussions exceeded the scope of the Court's authorization, the Court must determine whether suppression of the "non-call" statements is appropriate. As an "aggrieved person" under Title III, *see* 18 U.S.C. § 2510(11), Defendant Borch has standing to move for suppression of the "non-call" statements in "Call 476." *See id.* § 2518(10)(a); *see also United States v. Simpson*, 813 F.2d 1462, 1471 n. 11 (9th Cir.1987); *see generally In re Grand Jury Proceedings*, 841 F.2d 1048, 1053–54 (11th Cir.1988) (panel of Sixth Circuit judges sitting by designation of Chief Justice). In seeking suppression, Defendant Borch necessarily relies upon Title III's statutory exclusionary rule. *See* 18 U.S.C. §§ 2515, 2518(10)(a)(iii); *see also* 1968 U.S. Code Cong. & Admin.News at 2195 ("[Section 2518(10)(a)] provides the remedy for the right created by section 2515."). The Government takes the position that suppression is inappropriate in the case at bar because of the agents' lack of "bad faith conduct." *See, e.g., Couser*, 732 F.2d at 1209. The propriety of suppression, therefore, turns on Title III's intricate rule of exclusion.

Defendant Borch has raised a single, persuasive challenge to the interception of "non-call" conversation—nonconformity "with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(iii). Consequently, the Court's suppression inquiry need not include analysis of either constitutional considerations or preauthorization activity. *See United States v. Giordano*, 416 U.S. 505, 524–29, 94 S.Ct. 1820, 1831–33, 40 L.Ed.2d 341 (1974); *see also United States v. Cantu*, 625 F.Supp. 656, 662 (N.D.Fla.1985) (comparing subsections ii and iii of 18 U.S.C. § 2518(10)(a)). Rather, the Court must focus exclusively on the proper remedy for unsanctioned postauthorization activity that "ha[s] yet to undergo judicial scrutiny." *Cantu*, 625 F.Supp. at 666 n. 21.

In one of the earlier cases addressing the nature of Title III's exclusionary rule, the Sixth Circuit summarily ordered suppression of evidence obtained in violation of the applicable authorization order's terms. *See United States v. George*, 465 F.2d 772, 774 (6th Cir.1972). Offering little discussion on the subject, the *George* court simply concluded that subsection (iii) explicitly mandates suppression in response to such a violation. *Id.* (citing 18 U.S.C. § 2518(10)(a)(iii)). The absence of extensive discussion in *George* reflects the simple fact that subsection (iii), by its own language, unmistakably contemplates suppression whenever an "interception [is] not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(iii); *see also id.* § 2515.

Since the Sixth Circuit decided *George*, the United States Supreme Court has engrafted several limitations upon Title III's seemingly impervious exclusionary rule. The Supreme Court, however, has crafted exceptions to the statutory exclusionary rule only in the context of subsection (i). In *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), the Court commented that "[subsection] (i) was not intended to reach every failure to follow statutory procedures." *Id.* at 575, 94 S.Ct. at 1856. Applying the logic of *Chavez*, the Court ruled in *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), that minor violations of Title III's "broad identification requirement" need not result in suppression pur-

---

**5.** In the course of oral argument, the Government also suggested a "plain hearing" analogue to the "plain view" doctrine. While such a theory may have some application in the context of background conversation, *see, e.g., Couser*, 732 F.2d at 1210 (dictum concerning "plain view" analogue), the "plain hearing" concept is of no significance when "non-call" discourse is intercepted in the absence of contemporaneous telephonic discussion. *Basilicato*, 485 N.Y.S.2d at 12, 474 N.E.2d at 220.

suant to subsection (i). *Id.* at 437–40 & n. 25, 97 S.Ct. at 673–74 & n. 25. Moreover, the judicially created limitations apply only at the fringes of Title III. Neither *Chavez* nor *Donovan*, by the Supreme Court's own evaluation, involved "any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *See Chavez*, 416 U.S. at 575, 94 S.Ct. at 1856 (quoting from *Giordano*, 416 U.S. at 527, 94 S.Ct. at 1832); *Donovan*, 429 U.S. at 433–34, 97 S.Ct. at 671 (same). The case at bar, unlike *Chavez* and *Donovan*, focuses on activity that falls squarely within the ambit of subsection (iii). *See* 18 U.S.C. § 2518(10)(a)(iii). More importantly, though, the interception at issue in the case at bar exceeded the authorization order. As Title III's explicit requirement of judicial authorization plainly suggests, *see id.* § 2516, strict adherence to the authorization order is a requirement at the very core of Title III. *Cf. Giordano*, 416 U.S. at 527, 94 S.Ct. at 1832. Under well-settled Supreme Court precedent, then, the case at issue is profoundly different than the matters that have received Supreme Court scrutiny. Accordingly, the Court must not deviate from the Sixth Circuit's holding in *George*. *See George*, 465 F.2d at 774.

In an effort to avoid suppression, the Government suggested to the Court at oral argument that the monitoring agent was acting in good faith when the interception of "Call 476" took place. Writing for the majority in *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), Justice Rehnquist downplayed the significance of motivation in the context of Title III's statutory exclusionary rule. *See id.* at 139, 98 S.Ct. at 1724. In asserting "good faith" as an impediment to suppression, the Government endeavors to intertwine Fourth Amendment and Title III jurisprudence. In the Supreme Court's view, the two bodies of law cannot be so readily analogized. *See, e.g., Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831 ("The issue does not turn on the judicially fashioned exclu-

sionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III."); *see also Scott*, 436 U.S. at 138–39, 98 S.Ct. at 1723–24; *but see Couser*, 732 F.2d at 1209 (mingling *Chavez* "technical violation" test with "good faith" analysis). Application of Title III's rule of exclusion thus does not depend in whole or in part upon the "good faith" of the monitoring agent. Rather, suppression is necessary in this case to remedy an interception that exceeded the Court's authorization order, irrespective of the agent's "good faith." *Cf.* 18 U.S.C. § 2518(10)(a)(iii). As Congress unequivocally indicated, Title III's exclusionary rule "forms an integral part of the system of limitations *designed to protect privacy.*" 1968 U.S.Code Cong. & Admin.News at 2185 (emphasis added). To protect Defendant Borch's "legitimate privacy interest" in the intercepted "non-call" statements, *see, e.g., Feola*, 651 F.Supp. at 1107; *Basilicato*, 485 N.Y.S.2d at 11–12, 474 N.E.2d at 219–20, the Court shall enter an order barring the use of the "non-call" portion of "Call 476" against her in these proceedings. *See* 18 U.S.C. §§ 2515, 2518(10)(a)(iii).