**UNITED STATES of America**

v.

**Amado LOPEZ a/k/a Luis, Renaldo Lopez a/k/a Richie, Enrique Melendez a/k/a Kirikiri, a/k/a Kiki, Paul W. Mounts, Efrain Santana, Luis Delhoyo a/k/a Loco, Heidi A. Chaffee, Edwin Vega, Wendall Casler, Robert L. Dall, James W. Dall, Kirk Owen, Nina Pye, James R. Riggs, Jr., Donal A. Smith a/k/a Sonny, Laurie Smith, Anthony C. Stilkey, II, Jennifer C. Stilkey, Defendants.**

**No. CRIM. 99–79–P–C.**

United States District Court, D. Maine.

July 31, 2000.

---

Peter E. Rodway, Rodway & Horodyski, Portland, ME, for Amado Lopez.

Judith M. Wohl, Attorney at Law, Portland, ME, for Renaldo Lopez.

Bruce M. Merrill, Portland, ME, for Enrique Melendez.

David R. Beneman, Levenson, Vickerson & Beneman, Portland, ME, for Paul W Mounts.

Joel Vincent, Vincent & Kantz, Portland, ME, for Efrain Santana.

· Karen L. Morgan, Portland, ME, for Luis Delhoyo.

William Maselli, Sheila A. Cook, Law Office of William Maselli, Auburn, ME, for Heidi A Chafee.

Neale A. Duffett, Cloutier, Barrett, Cloutier & Conley, Portland, ME, for Edwin Vega.

Mary A. Davis, Tisdale & Davis, Portland, ME, for Wendall Casler.

James R. Bushell, Portland, ME, for Robert L Dall.

Anthony J. Sineni, III, Portland, ME, for James W Dall.

Joseph M. Wrobleski, Jr., Saco, ME, for Kirk Owen.

E. James Burke, Lewiston, ME, for Nina Pye.

John E. Geary, Falmouth, ME, for James R Riggs, Jr.

Walter F. McKee, Gregg D. Bernstein, Lipman & Katz, Augusta, ME, for Donald A Smith.

Michael J. Waxman, Portland, ME, Richard S. Emerson, Jr., Portland, ME, for Laurie Smith.

Jeffrey W. Langholtz, Biddeford, ME, for Anthony C Stilkey, II.

Robert A. Levine, Portland, ME, Benet Pols, Brunswick, ME, for Jennifer C Stilkey.

Jonathan A. Toof, Office of the U.S. Attorney, Portland, ME, for U.S.

## MEMORANDUM OF DECISION AND ORDER

CARTER, District Judge.

Presently before the Court are several motions to suppress recorded conversations gathered by the Government under the authority of an Order Authorizing the Interception of Wire Communications ("the Order") (Exhibit 1C). The Order was issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* ("Title III"). These motions represent the second round of motions to suppress the fruits of this wiretap. The Court denied the initial motions in a Memorandum of Decision ("the First Decision") (Docket No. 193). By the First Decision, and a conference of counsel on April 28, 2000, the Court invited Defendants to submit additional motions to suppress with respect to two issues that had not been raised by the initial motions, but which the Court had identified during the course of deciding the initial motions. In particular, the Court noted: (1) that the Application for Interception of Wire Communications ("the Application") failed to request permission to use civilian monitors or otherwise inform the issuing judge that such civilian monitors would be used and, as a result, the language of the Order on its face prohibited the interception of telephone calls by civilian monitors; and (2) that based on the testimony from the evidentiary hearing held with respect to the initial motions, the civilian monitors apparently were not supervised by law enforcement officers as Title III requires. *See* First Decision at n. 14.

Given that this was the first Title III wiretap in this district, and that the issues identified by the Court raised serious concerns about the propriety of this entire wiretap, the Court determined that the best course of action would be to permit Defendants to submit additional motions to suppress so that the two unresolved issues identified by the Court in the First Decision could be adequately examined. In response to this invitation, the Court received several motions. Specifically, Defendant Donald Smith has filed a motion (Docket No. 201), Defendant Chaffee has filed a motion (Docket No. 202), Defendant Santana has filed a motion (Docket No. 207), Defendant Amado Lopez has filed a motion (Docket No. 209), Defendant Owen has filed a motion (Docket No. 212), and Defendants Mounts and Melendez have filed a joint motion (Docket No. 213) (collectively, "the Motions"). Additionally, Defendant Renaldo Lopez has filed a motion (Docket No. 210) to join the motions

of Defendant Amado Lopez, as well as the joint motion of Defendants Mounts and Melendez. The Court held a two-day evidentiary hearing regarding the issues generated by these Motions.

Based on the evidence gathered in the hearings relative to the initial motions [1], as well as the additional evidentiary hearing held with respect to the Motions presently before the Court, the Court makes the following findings of fact.

Pursuant to the requirements of Title III, the Government submitted an application to Chief Judge Hornby as part of its efforts to obtain a wiretap order. The Application requested, in pertinent part, that

> this Court [Judge Hornby] issue an Order authorizing special agents of the United States Drug Enforcement Administration and other investigative and law enforcement officers, assisted, if necessary, by qualified translators, to intercept and record wire communications to and from the cellular telephone[s] ... subscribed to by Orlando Santana, Jr.....

Application (Exhibit 1A) at 5. Nowhere in the Application is there any explicit or implicit request that the issuing judge grant permission for the use of civilian monitors to intercept telephone calls during the proposed wiretap.

Based on the Government's Application, Judge Hornby permitted the wiretap by issuing the Order. The Order provides:

> Wherefore, it is hereby Ordered that special agents of the United States Drug Enforcement Administration and other

investigative and law enforcement officers, assisted, if necessary, by qualified translators, pursuant to the application of the Assistant United States Attorney Jonathan A. Toof, are authorized to intercept and record wire communications to and from the cellular telephone ... assigned and billed to Orlando Santana, Jr.....

Order at 2–3.

The wiretap plant was operated for approximately twenty days. Each day, monitoring took place from roughly 10:00 a.m. to 2:00 a.m. the following morning. Two civilian monitors were hired by the Government to intercept the calls.[2] The civilian monitors worked together sixteen hours a day for the duration of the wiretap. Their duties included operating the interception and recording equipment, listening to all calls, transcribing the calls onto log sheets, minimizing nonpertinent calls [3], and translating Spanish conversation into English.

The wiretap plant was overseen by assigned shift supervisors. Each day was split into two eight-hour shifts, with a different shift supervisor assigned to each shift. The position of shift supervisor was filled by Drug Enforcement Administration Special Agents and experienced law enforcement officers from the Brunswick Police Department. The shift supervisors were responsible for opening and closing the plant, securing the tape recordings in evidence bags and a locker, reviewing and signing the log sheets, dispatching surveillance teams as necessary, reporting important investigatory developments to the

---

1. All parties agreed that the evidence gathered in the first evidentiary hearing would be considered as part of the record for the present Motions as well.

2. Section 2518(5) of Title III provides, in part, that

   [a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investi-

   gative or law enforcement officer authorized to conduct the interception.

3. Minimization is the process by which intercepted telephone calls that do not pertain to the criminal investigation are not recorded or listened to for any longer than necessary. The minimization requirement is set forth in section 2518(5) of Title III. For a more detail discussion of minimization, see the Court's First Decision. 5

case agents, and supervising the civilian monitors.

With the exception of trips to the bathroom, the shift supervisors testified that they were always present in the monitoring plant while the wiretap was operational, and the civilian monitors were not left alone. The one apparent exception is an instance where Drug Enforcement Administration Special Agent McHugh left the plant for ten to fifteen minutes to conduct routine surveillance. In addition to the shift supervisors, one or both of the case agents were regularly present at the plant to monitor the calls or carry out other investigatory activities. Additionally, surveillance teams routinely spent down time at the wiretap plant listening to intercepted telephone calls.

While recording the conversation, the monitoring equipment simultaneously broadcasted the monitored conversation over a speaker. The calls were audible throughout the room in which the plant was located. Accordingly, the civilian monitors, the shift supervisors, and any other law enforcement officers present at the plant could listen to each telephone call as it was intercepted. The shift supervisors testified that they were familiar with the minimization instructions, understood that it was one of their responsibilities to ensure minimization efforts were carried out, and would have instructed the civilian monitors to minimize a nonpertinent call if necessary. However, such instructions from the shift supervisors to the civilian monitors were apparently unnecessary for two reasons. First, the shift supervisors testified that the civilian monitors were proficient and professional, and they did not need to be prompted to minimize nonpertinent calls. Second, because a vast majority of the calls were pertinent to the investigation, the shift supervisors and the civilian monitors agreed that very few of the intercepted telephone calls required minimization. Finally, a vast majority of

the telephone calls intercepted were in English, such that the civilian monitors were required to translate very few calls from Spanish into English.

■ The Court begins its analysis with the first issue generated by the First Decision—that the Government's Application failed to disclose the Government's intention to use civilian monitors and, as a result, that the use of the civilian monitors represented a violation of the express language of the Order, which permitted only law enforcement officers to intercept calls. Because these two potential violations relate to the plain language of two documents—the Application and the Order—no evidence provided at the second evidentiary hearing offers further insight into these matters.

In response to the present Motions that raise these issues, the Government points out that Title III includes no express requirement that the Government disclose to the issuing judge, either in its application or otherwise, its intention to use civilian monitors to conduct the wiretap. According to the Government, the failure to inform Judge Hornby in the Application of its intent to use civilian monitors was an oversight, but it does not constitute a violation of Title III.[4]

Despite the Government's disclosure in the Application of its intention to use translators, the Court remains troubled by the Government's failure to disclose its intent to use civilian monitors. A judge reading the Application would reasonably conclude from the language of the Application that law enforcement officers would be intercepting all telephone calls, with translators standing by to be used only as needed. Obviously, that is not how this wiretap was executed. This Application provided the issuing judge with no notice that civilian monitors were to conduct the entire intercept.

---

4. In its brief, the Government indicates that it intends in all future applications to advise the issuing judge of any intent to use civilian monitors.

Despite the absence of a statutory requirement that the use of civilian monitors pursuant to § 2518(5) be disclosed in an application for a wiretap, this Court believes that such a disclosure is required. The Court reaches this conclusion based on the overall scheme of Title III, which places rigorous burdens on the Government and law enforcement officers seeking to employ a wiretap. More specifically, this Court finds that an issuing judge is unable to effectively fulfill his or her statutory duty to ensure that a wiretap is conducted properly unless the judge is made aware that civilian monitors are being used. Therefore, the Court holds that implicit in Title III is a requirement that the Government inform the issuing judge of its intent to use civilian monitors, either in the application or by a separate written communication to the issuing judge, if, subsequent to the issuance of an intercept order, the Government decides to seek approval for the use of civilian monitors.

■ Similarly, the Court finds that civilian monitors may intercept communications only if the order authorizing interception expressly provides for the use of such monitors. Indeed, the absence of such express authority leads to a violation of the order—as happened in this case. The Order in this case allowed "special agents of the United States Drug Enforcement Administration and other investigative and law enforcement officers, assisted, if necessary, by qualified translators ... to intercept and record wire communications." Order at 2–3. Yet it is undisputed that the civilian monitors intercepted every call recorded during this wiretap. Accordingly, the Court reaffirms its conclusion in the First Decision that the use of civilian monitors to intercept calls was a violation of the plain language of the Order in this case. Even though the civilian monitors fulfilled two roles in this process—as monitors and translators—the Court remains satisfied that the Order was violated. The Order expressly states that translators will assist if necessary, yet it is undisputed that

very few of the calls intercepted required translation, such that there was no need for the civilians to intercept every call in their role as translators. As the Court reads the language of the Order, translators are permitted to translate calls as necessary—nothing more. This language does not envision that because Spanish may be used in some calls, the translators will intercept every incoming call, even when no translation is necessary. More to the point, the language of this Order plainly does not contemplate that civilian monitors will be exercising their judgment to decide which calls require minimization.

Having found these two violations—the failure to disclose the use of civilian monitors in the Application and the use of civilian monitors contrary to the language of the Order—the Court now must determine the appropriate remedy. Title III includes a remedy provision whereby an aggrieved person may move to suppress the contents of intercepted conversations. The statute provides that

> [a]ny aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—(i) the communication was unlawfully intercepted; (ii) the order or authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval....
>
> If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter.

18 U.S.C. § 2518(10)(a).

With respect to the insufficiency of the Application, the Court finds that such a

violation could implicate only § 2518(10)(a)(i), whereas the use of civilian monitors to intercept calls contrary to the plain language of the Order implicates § 2518(10)(a)(iii).

■ With regard to § 2518(10)(a)(i), the Supreme Court has held that "not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Donovan*, 429 U.S. 413, 433, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) (*quoting United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974)). Consequently, "suppression is required only for a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Donovan*, 429 U.S. at 433–34, 97 S.Ct. 658 (*quoting United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974)).

■ Applying the rule of *Donovan* to this case, the Court concludes that the failure of the Government to disclose in the Application its intent to use civilian monitors does not mean that communications were "unlawfully intercepted" under § 2518(10)(a)(i). Although the Court has determined that Title III implicitly requires the Government to reveal to the issuing judge its intent to use civilian monitors, the Court cannot say that such an implied requirement "directly and substantially" implements "the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary in-

vestigative device." *Donovan*, 429 U.S. at 433–34, 97 S.Ct. 658. Indeed, that the Court has inferred this requirement from the general scheme of Title III essentially dictates a finding that suppression is not warranted under the test set forth in *Donovan*. Accordingly, although the Court finds that the Application was deficient, such deficiency did not result in unlawful interceptions, and therefore suppression is not appropriate per § 2518(10)(a).[5]

■ Turning to the violation of the language of the Order, the Court concludes that the use of civilian monitors to intercept calls contrary to the plain language of the Order implicates § 2518(10)(a)(iii), which addresses those interceptions "not made in conformity with the order of authorization or approval." Although it is tempting to simply apply the rule of *Donovan* again, a careful reading of *Donovan*—as well as of the cases upon which it is based—demonstrates that its holding is limited to alleged violations under § 2518(10)(a)(i) and does not apply to an alleged violation under § 2518(10)(a)(iii). *See United States v. Lucht*, 18 F.3d 541, 547–48 (8th Cir.1994). The question becomes, then, what standard the Court should apply in light of the Court's finding that the use of civilian monitors violated the plain language of the Order. Obviously § 2518(a)(iii) should not be read to require suppression of every interception "not made in conformity" with a wiretap order regardless of the degree to which the manner of interception does not conform to an intercept order. Yet, the Court has been unable to unearth case law that provides guidance in this regard. In *Lucht*, instead of the *Donovan* test, the court applied well-established minimiza-

---

**5.** In addition to the rule of *Donovan*, the Court notes the following supplemental justifications for not ordering suppression as a result of the defective Application. First, there was no legal authority that compelled the Government to disclose its intention to use civilian monitors *at the time* the Application was submitted to Judge Hornby. Second, the Court is satisfied that there was no intent on

the part of the Government to deceive or mislead Judge Hornby with respect to its intent to use civilian monitors to carry out this wiretap. Indeed, given the express statutory authorization for employing civilian monitors, there is no reason to believe the issuing judge would not have permitted the use of civilian monitors had the Application so requested.

tion standards—as the facts in that case generated minimization issues. *See Lucht*, 18 F.3d at 547–48. However, the minimization standards are not directly analogous to this issue for two reasons. First, to the extent that improper minimization implicates § 2518(5), a failure to properly minimize could be characterized as an unlawful interception under § 2518(10)(a)(i), as opposed to a failure to comply with the interception order per § 2518(10)(a)(iii). Second, to the extent that an analysis of minimization standards does address a possible failure to comply with the interception order (because, for example, the order includes or references distinct minimization instructions), the analysis decides whether the minimization efforts, taken as a whole, constitute a violation of the order, not—as is the case here—whether the violation of the order is sufficiently serious as to require suppression. Again, the Court has already found a violation of the Order, and the only remaining issue is what is the appropriate sanction.

At least one court has held that § 2518(10)(a)(iii) dictates that any violation of the intercept order requires suppression. In *United States v. Borch*, 695 F.Supp. 898, (E.D.Mich.1988), Judge Churchill, interpreting *United States v. George*, 465 F.2d 772 (6th Cir.1972), held that "subsection (iii), by its own language, unmistakably contemplates suppression *whenever* an interception is not made in conformity with the order of authorization or approval." *Borch*, 695 F.Supp. at 902 (internal quotation marks omitted) (emphasis added). However, the Court of Appeals for the Sixth Circuit, in reversing the *Borch* decision on other grounds, noted that Judge Churchill had read *George* "too broadly." *United States v. Baranek*, 903 F.2d 1068, n. 4 (6th Cir.1990). The *Baranek* court went on to say that they were "not prepared to hold, as did ... [J]udge [Churchill], that any departure from the order or authorization will result, ipso facto, in suppression." *Id.* Unfortunately, the *Baranek* court did not explore what kinds of "departures" from the order would require suppression, and what kinds would not.

The Court is persuaded by the *Baranek* court's conclusion that not every failure to comply with an interception order dictates suppression. The plain language of § 2518(10)(a) does not demand suppression if a court finds that any of the requirements of subsections (i), (ii), or (iii) have been satisfied; instead, the provision merely sets forth the grounds upon which a person with standing may seek suppression. The Court does not understand § 2518(10)(a) to strip courts of all discretion to evaluate the relevant facts and circumstances in order to determine if suppression is appropriate in the circumstances of a particular case.[6] Accordingly, the Court will evaluate the violation of the Order to determine if suppression is appropriate.[7]

---

6. As an example, in *Borch*, the violation of the order related to only one intercepted conversation, such that the district court judge suppressed only one phone call. In this case, however, the violation of the order relates to every intercepted call. The Court does not believe that Congress, in enacting § 2518(10)(a) intended to divest the courts of the ability to weigh the severity and the breadth of a violation of the order, such that minor noncompliance with the order, such as recording the intercepted conversations on compact disks when the order required audio tapes, commands suppression of the entire wiretap.

7. With respect to § 2518(10)(a)(i), the *Donovan* Court essentially maintained, within the courts, some discretion to determine what it means to be an "unlawful" interception. Similar discretion is less likely to be available with respect to alleged failures to comply with the intercept order, pursuant to § 2518(10)(a)(iii), as an action typically either does or does not conform with the intercept order. Accordingly, this Court's holding that it may assess the relative seriousness of a failure to conform with the intercept order to determine if suppression is warranted is consistent with *Donovan*. Both holdings preserve within the courts some amount of discretion to decide if suppression is the proper

The Court begins its analysis by noting that the violation—here, having civilian monitors intercept telephone calls despite the Order's requirement that law enforcement officers conduct the intercepts—is more than a minor or technical violation. The use of civilian monitors to intercept every telephone call monitored during this wiretap, despite clear language in the Order to the contrary, represents a significant failure to follow Judge Hornby's Order.[8] However, the Court is also satisfied from the evidence that the violation was inadvertent, as opposed to a conscious decision by the Government or law enforcement officers to take action they knew to be contrary to an intercept order. Additionally, and most importantly, because the Court, after a full evidentiary hearing, has determined that the minimization efforts of the civilian monitors and the law enforcement officers were sufficient, it has been established that Defendants suffered no actual prejudice as a result of this violation of the Order.[9] In the First Decision, this Court held that the minimization efforts during the course of this wiretap were adequate. Nothing presented in the second hearing alters this Court's conclusion that the minimization efforts were adequate. Because the use of civilian monitors did not result in inadequate minimization, Defendants suffered no prejudice as a result of the use of civilian monitors contrary to the plain language of Judge Hornby's Order. Taken as a whole, the Court does not believe that this violation is sufficiently serious that justice requires suppression of the entire wiretap.

█ The Court now turns to the second issue generated by its First Decision, as well as by the present Motions: whether the civilian monitors were adequately supervised by law enforcement officers, as required by Title III. Section 2518(5) of Title III provides, in part, that

> [a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

Title III provides no definition of "supervision" as it is used in § 2518(5). Furthermore, no other provision of Title III provides the Court with direct guidance in determining what degree and quality of supervision are required by this section.

In the First Decision, this Court concluded that the supervision required by § 2518(5) must be meaningful and active supervision. The Court based this conclusion on the general scheme and purpose of Title III. Specifically, this Court concluded that Congress understood that a wiretap order represented one of the most invasive law enforcement techniques. Accordingly, Title III is replete with safeguards that work before a wiretap order is granted, during the execution of the order, and even after the wiretap has ceased. For example, Title III requires high-level Department of Justice approval before an application may be submitted to a court, § 2516; it requires the issuing judge to make detailed findings before the order is issued, § 2518(3); it requires that nonpertinent calls be minimized during interception, § 2518(5); and it requires that the

---

remedy for a failing on the part of the Government.

**8.** Indeed, it was the perceived gravity of this nonconformity which, in large part, caused the Court to initiate this second round of suppression motions.

**9.** By this reasoning, the Court does not intend to suggest that failure to comply with an intercept order should result in suppression

only if the defendant suffered actual prejudice as a result. The Court believes the gravity of each alleged violation of an intercept order must be analyzed in context. Here, based on previous findings of this Court, it has been established that the use of civilian monitors resulted in no actual prejudice to Defendants. Accordingly, it is entirely appropriate for the Court to consider and rely on that fact in analyzing the severity of this violation of the Order.

tapes be sealed and provided to the court promptly following completion of the wiretap, § 2518(5)(a). Given these express safeguards, the Court concluded in the First Decision that Congress, in requiring that civilian monitors be supervised, must have intended that such supervision be meaningful, active, and continuous, given that when civilian monitors are used, any lesser level of supervision could result in vital minimization efforts being conducted by persons lacking any law enforcement training.

The Court acknowledges that it reached this conclusion in the First Decision without the benefit of the legislative history—albeit a brief history—of the amendment to § 2518(5) of Title III that permitted the use of civilian monitors to conduct wiretaps. The provision allowing civilian monitors to intercept calls was added to Title III in 1986. After briefly explaining the effect of the amendment, the only legislative document referencing this provision indicates that the change, requested by the Federal Bureau of Investigation, "is designed to free field agents from the relatively routine activity of monitoring interceptions so that they can engage in other law enforcement activities." House Report No. 99–647, 99th Cong., 2d Sess., 1986 U.S.C.C.A.N. 3555. In light of this short but direct statement of Congress's intent, the Court must reconsider its early conclusion regarding the meaning of "supervision" in § 2518(5). The language of the House Report plainly indicates that Congress intended that supervision of civilian monitors need not be continuous, nor active, contrary to this Court's previous holding. Obviously Congress intended that civilian monitors could be left alone—presumably for extensive periods—so that the law enforcement officers, who would otherwise be conducting the interceptions themselves, may "engage in other law enforcement activities." Indeed, were the Court to hold that supervising law enforcement officers must always be present to supervise civilian monitors, such a finding would be contrary to the plain legislative intent evidenced by the House Report.

With this new understanding of what Congress intended to be adequate supervision of civilian monitors under § 2518(5), the Court examines the actual supervision provided to the two civilian monitors that executed the wiretap in this case. Here, the civilian monitors were, in essence, constantly supervised throughout the execution of the wiretap. All the shift supervisors understood that supervision of the civilian monitors was one of their responsibilities, and there is no persuasive evidence to suggest that any of the shift supervisors failed to carry out this duty. Additionally, the two case agents, and numerous other law enforcement officers involved in the investigation and familiar with the minimization instructions, were regularly present at the plant, could hear the intercepted calls, and were capable of providing supervision to the civilian monitors if necessary. Accordingly, the Court concludes that the supervision of the civilian monitors in this case was more than adequate to meet the requirements · of § 2518(5), as explained by the House Report.

Although the Court is constrained to follow the apparent intent of Congress, the Court is not constrained to agree with it. The Court finds it ironic that a process that begins with a requirement that the Attorney General or another high-level Department of Justice official provide authorization before the Government may even submit a wiretap application could end with a civilian, lacking law enforcement training, or lacking any education whatsoever, essentially executing the interceptions. The Court finds such a profound disconnect to be the result of an amendment that passed with no debate, and with no apparent understanding of the history and purposes of Title III.

The House Report's reference to the process of monitoring calls as "relatively routine" demonstrates a profound misunderstanding of the minimization require-

ments of Title III. Congress may be correct to refer to the process of recording calls and transcribing them as "relatively routine," but monitoring calls includes the additional requirement of minimizing non-pertinent and privileged calls. The minimization effort should be anything but routine. It requires constant vigilance to protect the fundamental privacy rights of those people whose communications are being intercepted—including many who are not named targets of the criminal investigation and who may never engage in criminal conduct. In essence, minimization requires the exercise of instantaneous, sound, legal judgment with respect to potentially complex matters—such as privilege—in order to protect fundamental constitutional rights. The Court cannot agree that the exercise of judgment in that context is "routine"—indeed, if it becomes routine, then it is not being done properly. Further, the Court cannot agree with Congress's decision to leave that judgment entirely in the hands of civilians without a single educational or training requirement.[10]

It is apparent to the Court that, in the real world, once the benefit of the 1986 amendment is utilized by the Government in executing a wiretap, the original level of privacy protection intended by the Congress in enacting the statute becomes ephemeral, if it does not evaporate entirely. The use of private, independent contractors, potentially without law enforcement experience, must necessarily seriously impair the ability of Title III, as an instrument of an effective legal policy, to guard against unwarranted invasion of privacy in the course of investi-

gating criminal activity. The amendment, ostensibly enacted at the behest of the Federal Bureau of Investigation because field agents find the monitoring function in wiretap exercises required by Title III to be unhappily tedious duty, purports to serve the preservation of privacy by requiring "supervision of an investigative or law enforcement officer authorized to conduct the investigation." 18 U.S.C. § 2518(5). The legislative history specifically reflects, however, that the purpose of the amendment is to "free" field agents from their monitoring duties "so that they can engage in other law enforcement activities." House Report No. 99–647, 99th Cong., 2d Sess., 1986 U.S.C.C.A.N. 3555. That statement of purpose probably negates, in practical terms, any realistic likelihood of precise, minute, and continuous supervision of the civilian contract personnel who actively do the monitoring because doing "other law enforcement activities" will almost certainly take the officers, at least occasionally, out of the environment where the monitoring is taking place or divert their attention for periods of time from the actual interception and its monitoring so that their supervision cannot be fully continuous and attentive to the intercepted language.

Thus, the standard of supervision contemplated by Congress by the amendment is obviously looser than that level of attention required to actually perform the monitoring function. The amendment can only be construed to implement a reasonable level of substantial and actual supervision consistent with the field agents' need to perform other investigatory duties. Clear-

---

**10.** In the end, it may be preferable to have sufficiently trained and experienced civilians conduct wiretap interceptions—as they could be more proficient than law enforcement officers who may have no experience in this field, or who may work on only one or two wiretaps over the course of a career. Indeed, in this case there is no doubt that the civilian monitors had more experience conducting wiretaps than all of the law enforcement personnel involved, save Special Agent Boyle. One

of the concerns the Court has after hearing how this wiretap was executed, however, is that inexperienced law enforcement officers will defer, perhaps unwisely, to civilian monitors who are familiar with the equipment and have experience conducting wiretaps, but who have no law enforcement training, expertise, or knowledge regarding concepts such as privilege, aside from that gained from reading minimization instructions.

ly, the required level of supervision is not envisaged to reflect that level of attention and focus required of those who actually execute the monitoring function. Further, the amendment permits the substitution of persons of unknown competence, training, and motive for sworn, experienced officers in whom the Court can have confidence as being properly trained, competent to execute the monitoring functions, and under an oath and a duty to act in accordance with the law and the terms of the orders of the Court.

The combined impact of these two considerations generated by the amendment effectively eviscerates, in practical terms, so much of the congressional mandate as was originally intended by Title III to assiduously guard, by the statute's minimization requirement, the properly-to-be-protected privacy interests of those investigated for crime, as well as the privacy interests of innocents who may communicate with the investigatory subjects. Hence, the amendment renders the statute, in practice, a more imperfect vehicle for the realization of one of its principal purposes than it was originally. The responsibility for this diminution in the effectiveness of the statute rests with the Congress which made the 1986 amendment.

The rectification of these perceived deficiencies in the statute, as amended, is properly within the legislative role of the Congress, if it wishes to do so. The Court cannot undertake to rewrite the statute to obviate them, the language of and factual and policy predicate for the 1986 amendment being clearly stated. The Court's only proper function in the narrow context of construing the requirement of Title III, in the circumstances of this case, is to determine if this wiretap was accomplished by the execution of that level of supervision of the civilian monitors contemplated by Title III. Having done so, the Court has concluded that the supervision of the civilian monitors was sufficient.

Accordingly, the Court **ORDERS** that the Motions to Suppress of Defendant Donald Smith (Docket No. 201), Defendant Chaffee (Docket No. 202), Defendant Santana (Docket No. 207), Defendant Amado Lopez (Docket No. 209), Defendant Owen (Docket No. 212), and Defendants Mounts and Melendez (Docket No. 213) be, and they are hereby, **DENIED.**[11]

---

**11.** Defendant Renaldo Lopez has moved to join the motion of Amado Lopez and the joint motion of Defendants Mounts and Melendez, but has not, independently, moved to suppress evidence. Accordingly, the Court grants Defendant Renaldo Lopez's Motion to Join. However, all motions Defendant Renaldo Lopez has joined are denied by this order.