# United States Court of Appeals
## For the First Circuit

No. 01-1390

UNITED STATES OF AMERICA,

Appellee,

v.

AMADO LÓPEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Torruella, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lynch, Circuit Judge.

Peter E. Rodway, with whom Rodway & Horodyski was on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, Appellate Chief, with whom Paula D. Silsby, United States Attorney, were on brief, for appellee.

August 20, 2002

**TORRUELLA**, **Circuit Judge**.  Defendant-appellant, Amado López ("López"), entered a conditional plea of guilty on charges of conspiring to possess cocaine and cocaine base with intent to distribute.  See 21 U.S.C. §§ 841, 846.  On appeal, López challenges an adverse ruling below on his motion to suppress evidence obtained pursuant to a wiretap warrant governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-22.  For the first time on appeal, the appellant also raises a constitutional challenge to the sentence imposed by the district court.  For the reasons set forth below, we reject López's arguments and affirm the rulings of the district court.

## I.  BACKGROUND

### A.  The conspiracy

In early April 1999, an agent of the Drug Enforcement Administration ("DEA") received information from a confidential source indicating that a cocaine distribution conspiracy was operating in the area of Brunswick, Maine.  With the help of the confidential source, undercover DEA agents were able to contact members of the conspiracy directly and arrange several controlled purchases of cocaine.  The DEA was also able to gain information concerning the conspiracy through other investigative techniques, including visual surveillance and pen-register analysis.  In addition, DEA agents obtained the assistance of at least one other

confidential source who was able to identify other members of the conspiracy.

On November 17, 1999, the government applied for authorization to conduct wiretaps of two mobile telephones allegedly used by members of the drug distribution ring. Along with the application, DEA Agent Brian Boyle ("Boyle") submitted an affidavit describing the investigation of the drug conspiracy to date. Boyle detailed the progress of the investigation and various investigative techniques that either had been tried previously or were deemed unlikely to succeed. Based on the government's application, Chief U.S. District Judge D. Brock Hornby granted the wiretap application. The order issued by Chief Judge Hornby provided:

> Wherefore, it is hereby Ordered that special agents of the United States Drug Enforcement Administration and other investigative and law enforcement officers, assisted, if necessary, by qualified translators, pursuant to the application of the Assistant United States Attorney Jonathan A. Toof, are authorized to intercept and record wire communications to and from the cellular telephone . . . assigned and billed to Orlando Santana, Jr. . . . .

The wiretap plant was operated for approximately twenty days. As a result of certain subscriber changes, the order was amended once during the course of the plant's operation. And on November 29 and December 7, 1999, the government filed progress reports with the court setting forth the number of calls intercepted, samples of the types of conversations recorded, and names of conspirators who had and had not been identified. See 18

U.S.C. § 2518(6) (providing that the authorizing judge may require the government to submit periodic progress reports).

Ultimately, the wiretap intercepted approximately 1700 telephone calls. Throughout the duration of the wiretap, the government relied on the services of civilian monitors working under contract with the government. The civilian monitors provided some translation services; however, the majority of the civilians' services consisted of monitoring all intercepted calls and performing "minimization" -- that is, the implementation of procedures established by the government to ensure that the fewest number of non-pertinent (or "innocent") calls are intercepted. See 18 U.S.C. § 2518(5) (providing for a minimization requirement in any order approving or extending a wiretap warrant).

Based on the information obtained through the wiretap, the government was able to build a formidable case against the conspiracy members. According to the appellant, a number of the intercepted telephone calls were particularly incriminating to him.

**B. Proceedings below**

López was indicted and charged together with seventeen other co-conspirators. Count I of the indictment charged López and the other defendants with a conspiracy to possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The remaining counts of the seven-count indictment pertained to conspirators other than López. The case was assigned to U.S. District Judge Gene Carter.

López, joined by most of the other defendants, moved to suppress the evidence gathered by the wiretap. López argued below: 1) that there was no probable cause to issue the wiretap authorization; 2) that the government failed to demonstrate in its application for wiretap authorization that conventional investigative techniques were ineffective; and 3) that the government failed to properly minimize the interception of the telephone calls. Judge Carter denied López's initial motion to suppress, but raised concerns in his written decision about the government's use of civilian monitors to conduct the minimization. See United States v. López, No. Crim. 99-79-P-V, 2000 WL 761977 (D. Me. April 28, 2000). Judge Carter then invited all of the defendants to file additional motions to suppress for the purpose of addressing this issue. López did so and argued that the government's use of civilian monitors exceeded the scope of the original wiretap authorization and, as a consequence, resulted in improper minimization of calls to the targeted phones. After this additional round of briefing, Judge Carter denied the motion to suppress. See United States v. López, 106 F. Supp. 2d 92 (D. Me. 2000).

Following the denial of the motion, López entered a conditional plea of guilty, preserving for appeal the admissibility of the wiretap evidence. Judge Carter then sentenced López to 240 months in prison. This timely appeal followed.

-5-

## II.  TITLE III

By enacting Title III, Congress sought to protect the privacy of wire and oral communications while, at the same time, authorizing the use of electronic surveillance evidence obtained by law enforcement under specified conditions. See Bartnicki v. Vopper, 532 U.S. 514, 523 (2001). In accordance with Congress's concern for preserving privacy, Title III makes the interception of electronic communications by law enforcement an extraordinary investigative technique whose use "is to be distinctly the exception -- not the rule." United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987). The statute thus imposes a number of strict requirements on the issuance and use of wiretap warrants. See United States v. Giordano, 416 U.S. 505, 515 (1974).

At the outset, a duly-authorized law enforcement officer must obtain approval from the Attorney General of the United States or a specially designated assistant attorney general in order to apply to a federal judge for a wiretap. See 18 U.S.C. § 2516(1). Once such approval is obtained, the officer must present a written application for a wiretap to the judge. Before issuing the wiretap, the judge must make certain enumerated findings and issue an ex parte order containing specified elements. See 18 U.S.C. § 2518(1), (3)-(4).

In the application for the wiretap, the government must make a detailed proffer including: (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application; (b) a full and

-6-

complete statement of the facts and circumstances justifying the applicant's belief that an order should be issued;[1] (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they appear to be too dangerous or unlikely to succeed if tried; (d) a statement of the period of time for which the interception is required to be maintained; and (e) a full and complete statement of the facts concerning all previous applications involving any of the same persons, facilities, or places specified in the application. See 18 U.S.C. § 2518(1)(a)-(e).

Finally, in the event the application is granted, Title III provides numerous grounds upon which communications obtained pursuant to a Title III warrant may be suppressed in any proceeding. Specifically, the statute states:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that -- (i) the communication was unlawfully intercepted; (ii) the order or authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in

---

[1] The government's statement of the facts and circumstances justifying its belief that an order should be issued must include: details as to the particular offense that has been, is being, or is about to be committed; a description of the nature and location of the facilities from which the communication is to be intercepted; a description of the type of communications sought to be intercepted; and the identity of the person committing the offense and whose communications are to be intercepted. See 18 U.S.C. § 2518(1)(b)(i)-(iv).

> conformity with the order of authorization or approval . . . .

Id. § 2518(10)(a).

López makes sundry arguments as to why the incriminating communications intercepted by the government must be suppressed. He argues first that the government's application was inadequate on its face to satisfy the so-called "necessity requirement" of Title III. See id. § 2518(1)(c). López also argues that the government neglected to disclose its intention to use civilian monitors and, therefore, that its subsequent use of such monitors violates Title III and compels the suppression of the intercepted calls. Lastly, López raises challenges to the monitor's minimization efforts and the supervision of the monitors by government agents. We address each of López's arguments in turn.

## A. The "necessity requirement"

Title III requires that a wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Hoffman, 832 F.2d at 1306 (quoting 18 U.S.C. § 2518(1)(c)); see also United States v. Kahn, 415 U.S. 143, 153 n.12 (1974) (noting that the necessity requirement was "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime"). In order to satisfy this requirement of necessity, the government must demonstrate that it has made "a reasonable, good

-8-

faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." Hoffman, 832 F.2d at 1306-07. However, the necessity requirement is not tantamount to an exhaustion requirement. See United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995) ("[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping.") (citations and quotations omitted); see also United States v. David, 940 F.2d 722, 728-29 (1st Cir. 1991) (holding that necessity was shown even though government had not attempted to use search warrants, pen registers, or undercover agents). Consequently, Title III does not "force the government to run outlandish risks . . . before seeking a wiretap." Hoffman, 832 F.2d at 1306.

In reviewing the sufficiency of the government's showing of necessity, the "'appeals court role is not to make a de novo determination of sufficiency as if it were [the issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989) (quoting United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977)). That is, "[t]he sufficiency of the affidavit is to be upheld where the appellate court determines that the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." Id.

-9-

López argues that the government's application was insufficient on its face. He characterizes the government's affidavit in support of the application as largely composed of conclusory assertions devoid of factual specificity. He also contends that the application reveals that the government failed to utilize some investigative avenues that still remained open.

To be sure, the government's affidavit must show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient. See 18 U.S.C. § 2518(1)(c) (requiring a "full and complete statement"); see also United States v. Castillo-García, 117 F.3d 1179, 1194 (10th Cir. 1997) ("[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application."). But in this case, we are satisfied that the government's application was more than minimally adequate to persuade the issuing judge that the warrant was reasonably necessary. It would be de trop for us to reiterate the analysis of Judge Carter in the court below, which we find to be both thorough and well reasoned, so we shall confine ourselves to some key observations.

The affidavit of DEA Agent Boyle described several alternative investigative techniques that had been tried and failed, appeared unlikely to succeed, might alert the conspirators, or were too dangerous to pursue.[2] Although several of the

---

[2] Specifically, Agent Boyle listed six such techniques: 1) physical surveillance; 2) grand jury subpoenas; 3) undercover drug purchases; 4) pen registers; 5) trap-and-trace devices; and 6)

-10-

techniques (such as physical surveillance, interrogation of informants, pen-register analysis, and controlled buys by undercover agents) had proven valuable in the past, the utility of those tools was exhausted or greatly diminished by the time the government sought its warrant.

As the details of Agent Boyle's affidavit demonstrate, the traditional techniques employed by the DEA over the course of several months had failed to establish the identity of some conspirators, particularly those at the top of the distribution chain. See United States v. Díaz, 176 F.3d 52, 110-11 (2d Cir. 1999) (holding that necessity for wiretap was shown because traditional techniques were not adequate to reveal sources of drug supply and location of drug proceeds); United States v. Cooper, 868 F.2d 1505, 1509-10 (6th Cir. 1989) (holding that necessity for wiretap was shown because wiretap followed lengthy investigation in which normal investigative procedures were used extensively but had not identified customers and agents of prescription drug ring). Moreover, the affidavit documents specific incidents suggesting that the further use of surveillance and undercover operations risked revealing the investigation and placing law enforcement officers in harm's way. For example, one conspirator expressed

---

search warrants. Cf. United States v. VanMeter, 278 F.3d 1156, 1153-64 (10th Cir. 2002) (noting that normal investigative procedures subject to 18 U.S.C. § 2518(1)(c) include: 1) standard visual and aural surveillance; 2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); 3) use of search warrants; 4) infiltration of conspiratorial groups by undercover agents; and 5) use of pen registers and trap-and-trace devices).

-11-

concern to an undercover agent about the "heat" in the area. Months later, the same conspirator refused to speak to or deal with the agent. One of the government's cooperating witnesses was also questioned by conspiracy members as to whether he was in league with the authorities. And the affidavit points to other instances where the conspirators engaged in counter-surveillance designed to avoid detection by law enforcement. See United States v. Williams, 124 F.3d 411, 418 (3d Cir. 1997) (necessity shown because government had been unable to use a confidential informant without high risk of discovery, and co-conspirators used evasive techniques such as electronic detection equipment); United States v. Carrazana, 921 F.2d 1557, 1564-65 (11th Cir. 1991) (necessity for wiretap shown because other investigative methods were unsuccessful due to drug ring's counter-surveillance protection).

Other investigative techniques that were not tried by the government were also inadequate because they might have revealed the ongoing investigation. The execution of a search warrant or issuance of grand jury subpoenas would have likely alerted other conspiracy members to law enforcement's investigation. Also, although López suggests that a handful of cooperating sources (including two active conspiracy members who had been arrested during the course of the investigation) could have provided useful grand jury testimony, we think the issuing judge would have been justified in doubting the efficacy of such action. As Agent Boyle states in his affidavit, two of the cooperating sources had limited information concerning the full scope of the conspiracy, and

-12-

calling other cooperating sources before the grand jury could arouse the suspicions of others.

Viewed as a whole, the information contained in the government's application for the Title III warrant was not, as López suggests, mere boilerplate. Nor were the circumstances surrounding the government's investigation of the drug conspiracy so commonplace or generic that our approval of the issuance of the warrant in this case would assure that a warrant could be issued in virtually any drug investigation. The government provided the issuing judge with specific factors -- particularly the DEA's inability to identify key conspiracy members and the conspiracy's growing awareness of law enforcement activity -- that militated in favor of using a more drastic investigative tool. We therefore affirm the district court's ruling that the government's warrant application satisfied Title III's necessity requirement.

## B. Civilian monitors

López argues next that the communications must be suppressed because the government violated Title III by failing to disclose to the issuing judge that civilian monitors would be utilized during the interception process. Although we agree with López that the government must disclose its intention to use civilian monitors, we do not find the failure to do so in this case to be sufficient grounds to suppress the communications.

There is no doubt that the use of civilian monitors for the execution of a wiretap cannot constitute a per se violation of Title III, since the statute explicitly contemplates the assistance

of civilian personnel. Specifically, Title III provides, in relevant part: "An interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." 18 U.S.C. § 2518(5). Nevertheless, Title III generally places a burden of "full and complete" disclosure on the government in its application for a wiretap, see id. § 2518(1)(b),(c) & (d), and the issuing judge is obliged to craft the order approving the wiretap with specificity, see id. § 2518(4). These provisions necessitate candor on the part of the government -- a candor that, in our view, would generally be undermined if the government could withhold important information about the manner in which the wiretap will be conducted.

The government's failure to disclose its plans to use civilian monitors frustrates the objectives of other provisions of Title III as well. For example, the statute mandates that the issuing judge include in any order a provision requiring that the wiretap be conducted in such a way as to minimize nonpertinent communications. See id. § 2518(5). If the issuing judge is kept ignorant of the manner in which the government intends to execute the wiretap, this diminishes the judge's ability to craft an order that is sufficiently protective of the minimization requirement. In addition, the statute permits the issuing judge to require status reports showing "what progress has been made toward achievement of the authorized objective and the need for continued

-14-

interception." Id. § 2518(6). Yet, without information on how the calls are being intercepted, and by what personnel, the judge's impression of the progress of the wiretap may be mistaken.

In light of these considerations, we hold that the government must disclose, as a part of its application for a wiretap warrant, any intention to utilize the services of civilian monitors in the execution of the warrant. To hold otherwise would, in our view, run counter to the general duty of candor the statute imposes on the government and impair the issuing judge's ability to preserve important privacy interests protected by Title III.

Having established that Title III requires the government to provide the issuing judge with information on any plans to employ civilian monitors, we turn to the question of whether the government's conduct in this particular case requires the suppression of the communications that incriminate López. Title III sets out a broadly-worded statutory exclusion rule that, on its face, prohibits the use at trial of any evidence "derived from" a wiretap "if the disclosure of that information would be in violation of this chapter." Id. § 2515. The government's failure to disclose its intention to use civilian monitors, which violates an obligation under Title III, thus lays the foundation for a motion to suppress.[3]

---

[3] The district court separated its analysis of suppression into two categories, reasoning that the failure to disclose provided grounds for suppression 18 U.S.C. § 2518(10)(a)(i) (providing for suppression of communications that are "unlawfully intercepted"), while the resulting failure of the warrant to authorize civilian monitors might give rise to a suppression motion under 18 U.S.C. § 2518(10)(a)(iii) (providing for suppression where "the

-15-

Despite the broad language of § 2515, "it is well-settled that not every failure to comply fully with any requirement provided in Title III necessitates suppression." United States v. Escobar-De Jesús, 187 F.3d 148, 171 (1st Cir. 1999); see United States v. Donovan, 429 U.S. 413, 432-34 (1977); United States v. Chavez, 416 U.S. 562, 571-79 (1974). A court evaluating a suppression motion must consider whether the underlying violation of Title III frustrated the protective purpose of that statute in a particular case. Thus, "violations of even . . . central requirements do not mandate suppression if the government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." United States v. Cunningham, 113 F.3d 289, 293-94 (1st Cir. 1997) (quoting United States v. Johnson, 696 F.2d 115, 121 (D.C. Cir. 1982)). Without trivializing the nature of the violation in this case, we find that the wiretap was conducted in manner that preserved the core protective purposes of Title III.

The restrictions in Title III aim to limit the use of wiretapping to those situations where it is truly justified, and to protect privacy as mush as reasonably possible when wiretapping is used. See Escobar-De Jesús, 187 F.3d at 171. The undisclosed use of civilian monitors did not affect the likelihood that the wiretap would be authorized in the first place, nor did it increase the

interception was not made in conformity with the order of authorization or approval"). See López, 106 F. Supp. 2d at 97-98. Because our suppression analysis evaluates the same factors and reaches the same conclusion on both of these arguably distinct grounds, we consider them together.

-16-

wiretap's intrusion on privacy interests.  The principal purposes of Title III were not frustrated by the violations here.

In addition, the district court's unchallenged findings demonstrate that, aside from the failure to disclose the use of civilian monitors, the wiretap was conducted in an admirably professional manner.  Privacy concerns were protected to the greatest extent possible.  Suppression is less likely to be necessary when the violation of Title III represents an isolated flaw in "a process that in all other important respects complied with the statute."  Cunnignham, 113 F.3d at 294.

Finally, there is no indication that the government's violations of Title III were willful or knowing.  We are the first court of appeals to hold that Title III requires the government to disclose any plans to employ civilian monitors; indeed, we appear to be the first court that has been squarely presented with the issue.  Thus, the law enforcement in this case presumably did not realize that their undisclosed use of civilian monitors could constitute a violation of the statute.  The district court determined that, although the used of civilian monitors departed from the precise terms of the order authorizing the wiretap, "the violation was inadvertent, as opposed to a conscious decision by the Government or law enforcement officers to take action they knew to be contrary to an intercept order."  López, 106 F. Supp. 2d at 100.

In sum, Title III imposes an obligation on the government to disclose to the issuing judge any plans to use civilian monitors

in the execution of a wiretap warrant.  In the case at hand, however, the government's failure to make that disclosure, along with the government's seeming violation of an order that did not permit the use of civilian monitors, does not provide a valid basis for suppressing the intercepted communications.

## C.  Miscellaneous issues

López offers two remaining arguments as to why the intercepted communications should be suppressed.  We think both arguments lack merit and address them only briefly.

First, López contends that the government violated the requirement that civilian monitors conducting an interception must be "supervis[ed]" by an "investigative or law enforcement officer authorized to conduct the interception."  18 U.S.C. § 2518(5).  Even assuming that a violation of this requirement could conceivably provide the basis for a motion to suppress, López's argument in this case is sunk by the findings of the district court.

According to the opinion below, the civilian monitors, who worked sixteen-hour shifts every day for twenty days, were supervised at all times by a shift supervisor.  The one apparent exception was a single instance where the supervising agent left the plant for ten to fifteen minutes to conduct routine surveillance.  López does not appear to challenge Judge Carter's findings as clearly erroneous.  See United States v. Hawkins, 279 F.3d 83, 85 (1st Cir. 2002) ("[W]e review the factual findings of the district court for clear error.").  Instead he argues that, as

a matter of law, the single lapse of supervision taints all of the intercepted communications. We disagree, and think that such a de minimis departure from the supervision standard is no basis for excluding the communications. This is especially so where, as here, López makes no attempt to identify any prejudice arising from the interception of communications that might have occurred during the brief unsupervised period.

Second, López argues that the civilian monitors were ineffective at minimizing non-pertinent calls, as is required by 18 U.S.C. § 2518(5). The minimization requirement "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects." Hoffman, 832 F.2d at 1307. When fulfilling its obligation to minimize unauthorized communications, "'[t]he government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required.'" United States v. Charles, 213 F.3d 10, 22 (1st Cir.) (quoting United States v. Uribe, 890 F.2d 554, 557 (1st Cir. 1989)), cert. denied, 531 U.S. 915 (2000). In examining the government's adherence to this standard, we look at several factors, including: 1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process. See United States v. London, 66 F.3d 1227, 1236 (1st Cir. 1995).

-19-

Judged by these criteria, the government's minimization efforts in this case far exceeded what was required; indeed, its performance bordered on perfection. The wiretap intercepted approximately 1700 calls. Of that large number, López and his co-defendants could identify only six calls that arguably were unrelated to the drug conspiracy. This amounts to only 0.35% of the total number of calls intercepted. Furthermore, the district court analyzed the six challenged calls and found as a fact, unchallenged in this appeal, that only two of them were improperly minimized. Thus, the sum total of impermissibly intercepted calls was a mere 0.11% of the total calls. López, 2000 WL 761977, at *9.

Although "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide" to determining whether the minimization was proper, Scott v. United States, 436 U.S. 128, 140 (1978), the nearly flawless performance of the government in this case carries significant weight. Cf. United States v. Bennett, 219 F.3d 1117, 1124 (9th Cir.) (minimization requirement met where improperly intercepted calls accounted for only 3.65% of 7322 total intercepted calls), cert. denied, 531 U.S. 1056 (2000). Plus, the findings of the district court support the conclusion that the government established and observed thorough precautions to bring about minimization and that there was a significant degree of judicial supervision over the surveillance process. See London, 66 F.3d at 1236. Finally, as the district court found, López was not prejudiced in any way by the improper minimization of the two calls. The district court's decision not

to suppress the communications was therefore justified in all respects.

### III.  SENTENCING

Forging ahead pro se, López challenges the 240-month sentence imposed by the district court as violative of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000).[4] Because we conclude that López voluntarily relinquished his Apprendi arguments below, we affirm the sentence imposed by the district court.

The indictment under which López was charged alleged that he was subject to the penalty provisions of 21 U.S.C. § 841 (b)(1)(A) (providing for a maximum sentence of life).  However, the indictment, which was issued pre-Apprendi, did not specify a drug quantity.  After Apprendi was decided, the government agreed not to seek a new indictment that alleged a drug amount and to limit López's sentence exposure to 20 years.

The flawed indictment became a well-worn topic in the district court during the sentencing proceedings.  On October 3, 2000, after hearings and rulings on suppression motions, López appeared, with counsel, to enter a plea of guilty.  When asked whether he was pleading guilty because he was guilty and for no

---

[4]   The central teaching of Apprendi is that the Fourteenth Amendment right to due process and the Sixth Amendment right to trial by jury require that "'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'"  530 U.S. at 476 (quoting Jones v. United States, 526 U.S. 227, 243 n.6 (1999)).

-21-

other reason, López responded, "I have another reason . . . [t]he _Apprendi_ case." At this point, defense counsel interjected, "What I have told [López] . . . is that it is my belief that . . . _Apprendi_ can only allow for a sentence up to 20 years . . . ." Judge Carter conceded the irregularity but noted that the government stood ready to re-charge López under an indictment that specified a drug quantity. Judge Carter also pointed out that a superceding indictment could increase the maximum sentence exposure beyond 240 months. Defense counsel then admitted that he had advised López "from a strategic standpoint" that it was in his best interest to plead guilty before the government could take such action.

After this discussion, the court again asked López if he was pleading guilty because he was guilty. López replied that he was. The court then asked, "Is the only other reason you have to tender this plea, your desire to limit exposure to the length of the period of incarceration?" López replied, "yes." After explaining to López the rights that he surrendered by pleading guilty, Judge Carter ascertained that López understood and waived these rights. López was then sentenced to 240 months in prison.

For the first time on appeal, López now argues that his sentence violated _Apprendi_ because the government was derelict in its duty to charge a drug quantity in the indictment. Finding that

this case presents one of the clearest examples of waiver imaginable, we reject López's entreaty.[5]

A party's mere <u>forfeiture</u>, or failure to timely assert a right, does not preclude appellate review for "plain error" under Federal Rule of Criminal Procedure 52(b), but a <u>waiver</u> of a right bars even this highly deferential form of scrutiny.  <u>See</u> <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 733 (1993); <u>see also</u> <u>United States</u> v. <u>Lemmerer</u>, 277 F.3d 579, 591 n.4 (1st Cir. 2002).  In order for us to find waiver, the party must have made an "'intentional relinquishment or abandonment'" of a known right.  <u>United States</u> v. <u>Mitchell</u>, 85 F.3d 800, 807 (1st Cir. 1996) (quoting <u>Olano</u>, 507 U.S. at 733).

In this case, there is no doubt that López was well aware that <u>Apprendi</u> carried implications for his case.  As López stated during the plea colloquy, his attorney had advised him to plead guilty under the present indictment precisely because of the effect of <u>Apprendi</u>.  Judge Carter also apprised López of the potential <u>Apprendi</u> issue.  Indeed, Judge Carter guaranteed that the sentence

---

[5]  López also appears to argue that absence of a drug quantity element in the indictment deprived the district court of jurisdiction and requires the vacatur of his sentence.  This argument is foreclosed by the Supreme Court's recent decision in <u>United States</u> v. <u>Cotton</u>, 122 S. Ct. 1781 (2002).  Addressing a defendant's conviction under of 21 U.S.C. §§ 846 and 841(a)(1), the Court in <u>Cotton</u> unanimously held that the failure of the government to include a drug quantity in the indictment was not a jurisdictional defect that deprived a federal court of the power to impose a sentence.  <u>See</u> 122 S. Ct. at 1785.  Instead, the Court found that a sentence based on an indictment lacking a specific drug quantity would be reviewed for "plain error."  <u>Id.</u>  Since we find no valid claim of error to review, López's jurisdictional argument is a non-starter.

imposed would be consistent with Apprendi, and stated that he would allow López to withdraw his guilty plea and proceed to trial if a sentence in excess of 20 years were handed down.[6] When the 20-year sentence was announced, López did not object or seek to withdraw his plea.

Furthermore, López gained a valuable benefit by acquiescing to the charges in the original indictment. As noted above, the government was prepared to seek a superseding indictment with a specific drug quantity. Had the government done so, López would have doubtlessly faced a harsher sentence. For this reason, López's counsel recognized that, "from a strategic standpoint," López was better off pleading guilty to the original indictment. López also admitted that his plea was based in part on his desire to limit his exposure for purposes of sentencing. López cannot now appeal what he earlier used as a pawn to better his situation.

Because López knowingly and voluntarily relinquished any appeal stemming from the Supreme Court's decision in Apprendi (and

---

[6] The sentence imposed by the district court insured that, even if López's belated Apprendi arguments could be reviewed for "plain error," see Fed. R. Crim. P. 52(b), there is simply no "error" to correct. The "default" or "catchall" provision of the statute under which López was charged, 21 U.S.C. § 841(b)(1)(C), prescribes that a 240-month maximum sentence may be imposed for trafficking even the smallest quantity of cocaine. United States v. López-López, 282 F.3d 1, 22 (1st Cir.), cert. denied, 122 S. Ct. 2642 (2002). Thus, Judge Carter's sentence, set at the upper limit of what is permitted by 21 U.S.C. § 841(b)(1)(C), did not violate Apprendi, which "applies only when the disputed 'fact' enlarges the applicable statutory maximum and the defendant's sentence exceeds the original maximum." United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001).

thereby gained a valuable benefit), we cannot review his claims of error.

## IV.   CONCLUSION

The district court handled this case in praiseworthy fashion.  We find nothing in López's appeal that would compel any alteration of the rulings below.

**<u>Affirmed</u>**.