# United States Court of Appeals
## For the First Circuit

No. 15-2087

UNITED STATES OF AMERICA,

Appellee,

v.

DIMITRY GORDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Torruella, Selya and Kayatta,
Circuit Judges.

Edward S. MacColl, with whom Thompson, MacColl & Bass, LLC,
P.A. was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Richard W. Murphy, Acting United States Attorney, and Margaret D.
McGaughey, Assistant United States Attorney, Appellate Chief, were
on brief, for appellee.

September 8, 2017

**SELYA**, **Circuit Judge**.  Defendant-appellant Dimitry Gordon strives to persuade us that the district court erred in denying his motion to suppress wiretap evidence and/or in refusing to hold one or more evidentiary hearings in connection therewith. We are not convinced and, therefore, we affirm the challenged orders (that is, the order denying the motion to suppress and the orders denying the two requests for evidentiary hearings).

## I.  BACKGROUND

Around September of 2012, a joint task force spearheaded by the federal Drug Enforcement Administration (DEA), and including state and local law enforcement officers, began investigating a drug-distribution ring centered in Lewiston, Maine.  This probe led investigators to identify Romelly Dastinot and Jacques Victor as the likely leaders of the ring.[1] The task force came to believe that the two regularly pooled their resources to buy drugs in bulk quantities in Boston and transport them to Maine.  Once the drugs arrived in Maine, the pair apparently peddled them through separate distribution channels.

In the course of its investigation, the task force obtained Dastinot's and Victor's telephone records.  That trove of

---

[1] This appeal was consolidated for oral argument with an appeal taken by Dastinot, which raised a narrower subset of the issues advanced by the appellant.  Dastinot's appeal, No. 16-1272, will be resolved by means of a separate opinion.

information yielded several text-message exchanges detailing drug transactions.

In addition, the task force implemented a gallimaufry of other investigative strategies. To cite one example, it executed controlled buys from both Dastinot and Victor. Some of the controlled buys implicated the appellant as a lower-level member of the conspiracy, who sold drugs (either oxycodone pills or crack cocaine) on Dastinot's behalf. To cite another example, the task force partnered with confidential sources and turncoat members of the drug ring.[2]

Despite its investigative efforts, the task force was unable to learn either the identity or specific location of the drug ring's suppliers. Nor was the task force able to get a handle on the drug ring's organizational structure. In hopes of catching bigger fish, the government submitted a series of wiretap applications to the district court between February and May of 2014, seeking to monitor a total of five telephones. Only three of the target telephones, known as TT1, TT2, and TT5, are relevant to this appeal (Dastinot used TT1 and TT5, while Victor used TT2).

---

[2] The record reflects that the task force's investigation involved no fewer than four confidential sources and that some seven members of the drug ring cooperated with the government at various stages of the investigation. For ease in exposition, we do not distinguish between the confidential sources and the turncoats but, rather, refer to all of them as cooperating sources.

The appellant was identified as a target-subject of the wiretaps even though his own telephone was never tapped.

A DEA agent, Joey Brown, prepared supporting affidavits for the wiretap applications. All of these applications were approved by the district court and renewed as needed. See 18 U.S.C. § 2518(5) (limiting wiretap authorization to thirty days). In Agent Brown's first affidavit (dated February 24, 2014), he spelled out investigative techniques that the task force had used up to that point. For instance, investigators had worked extensively with cooperating sources, executed controlled purchases, analyzed telephone data (obtained through pen registers, telephone toll records, historical text-message records, and trap-and-trace devices), conducted physical surveillance, examined public records, and used available subpoena powers (both administrative and grand jury).

The affidavit identified the objectives of the wiretap investigation as obtaining:

> a. The identity of the sources of supply for Dastinot and Victor, their locations, and the manner in which they acquire[d] and transport[ed] drugs to Maine and elsewhere for distribution;
>
> b. The precise roles of the Target Subjects [including the appellant] in this drug conspiracy and the methods being utilized by the Target Subjects to distribute illegal drugs;

c. The identity of all persons receiving drugs from Dastinot and Victor for further distribution;

d. Identification of the site(s) being utilized for the storage and concealment of illegal drugs;

e. The existence, location and disposition of proceeds (including currency, real estate, motor vehicles, and personal property) derived from the Target Subjects' involvement in drug distribution;

f. The precise date(s), time(s) and location(s) of shipments of illegal drugs to/from this organization and the manner of delivery.

The affidavit revealed that the task force had learned very little about the drug ring's sources of supply, finances, organizational structure, or the roles of its members.

According to Brown, the task force had mulled a number of additional investigative strategies, but had rejected them as either too risky or too unlikely to yield worthwhile results. In this vein, the task force had decided against conducting more aggressive physical surveillance, attempting to install cameras in selected public locations, obtaining search warrants for known drug-distribution venues, collecting target-subjects' trash, widening the use of grand jury interviews, or attempting to introduce undercover agents into the ring. Brown added that he did not believe that further controlled purchases would yield more information about the drug ring. Nor did he think that either

approaching or arresting the target-subjects and asking them to reveal their sources of supply was apt to prove fruitful.

Brown also noted that the task force had considered obtaining cell-site location information for at least some of the telephones. This option was rejected because "the range of error in this type of data prevents narrowing down a precise residence (especially in dense places like Boston and Lewiston)." What is more, the location data are often several minutes behind the actual location of the telephone. And location data alone, he reasoned, whether from cell-site records or from vehicle trackers, would not reveal the identity of the person with whom a target-subject meets or the nature of the encounter.

Brown concluded that wiretapping was "the only available technique that ha[d] a reasonable likelihood of securing the evidence necessary to accomplish the goals of th[e] investigation." His affidavit chronicled minimization procedures that would be instituted if the wiretaps were approved. At the outset, the monitors (the persons intercepting calls) would be provided with a minimization memorandum, the wiretap applications, and the authorizing orders. In pertinent part, the memorandum instructed that monitors should stop listening to conversations that did not relate to the criminal enterprise (though they could periodically check on seemingly innocuous discussions to see if

the conversation had shifted). Each monitor would sign a form indicating that he had read the documents.

After the district court granted the first of the wiretap applications, the task force set up a wire room to serve as a central location for intercepting and monitoring calls. The room was staffed from 8:00 a.m. to midnight, and any calls not monitored by staff in real time were not recorded. Through the duration of the wiretaps, the authorities intercepted approximately 23,000 completed calls and text messages, many of which were in Haitian Creole (the language of choice for members of the drug ring). Along the way, the government compiled and submitted periodic statistical summaries to the district court.

Armed with, inter alia, the fruits of the wiretapping, a federal grand jury sitting in the District of Maine indicted the appellant and eleven codefendants. The indictment charged the appellant with conspiracy to distribute and possess with intent to distribute controlled substances, see 21 U.S.C. §§ 841(a)(1), 846, and conspiracy to commit money laundering, see 18 U.S.C. § 1956(a)(1)(B)(i).

In due course, the appellant moved to suppress the evidence obtained through the wiretaps and requested two kinds of evidentiary hearings. First, he requested a general evidentiary hearing as to the adequacy of the government's minimization procedures. Second, he requested a Franks hearing on the ground

that Brown's affidavits in support of the wiretap applications included false statements.  See Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

The district court heard arguments on these motions on January 28, 2015, but reserved decision.  It later ordered the government to submit additional information regarding the statistical makeup of the intercepted conversations.  In response, the government submitted Brown's supplemental affidavit dated February 13, 2015, which clarified and corrected the double-counting of some intercepted calls and reported that 14% of the calls lasting more than two minutes had been minimized in some way.

After further briefing, the district court denied not only the motion to suppress but also the twin requests for evidentiary hearings.  The appellant thereafter entered a conditional guilty plea to the drug conspiracy count, see Fed. R. Crim. P. 11(a)(2), preserving his right to appeal the denial of both his motion to suppress and his related requests for evidentiary hearings.  The district court accepted the conditional plea and subsequently sentenced the appellant to a 28-month term of immurement.  At the same time, the court dismissed the money laundering charge.  This timely appeal followed.

## II.  THE MOTION TO SUPPRESS

Insisting that his motion to suppress the wiretap evidence should have been granted, the appellant, ably represented, attacks the wiretap orders on multiple fronts.  We start with his assertion that the orders were insufficiently particular.  We next proceed to his claims that wiretapping was unnecessary and that, in all events, the government failed adequately to minimize its intrusion into the target-subjects' privacy rights.

Familiar standards of review guide our analysis.  When assaying a district court's ruling on a motion to suppress wiretap evidence, we review its factual findings for clear error and its legal conclusions de novo.  See United States v. Lyons, 740 F.3d 702, 720-21 (1st Cir. 2014).  The key question is whether the wiretap application and its supporting affidavits were "minimally adequate" to support the issuance of the wiretap order.  United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003) (quoting United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003)).

### A.  Particularity.

With the passage of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), see 18 U.S.C. §§ 2510-2522, Congress authorized wiretapping as needed to allow effective investigation of criminal activities while at the same time ensuring meaningful judicial supervision and requiring

specific procedures to safeguard privacy rights.  See United States v. Rodrigues, 850 F.3d 1, 6 (1st Cir. 2017); see also Gelbard v. United States, 408 U.S. 41, 48 (1972) (describing Title III as "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized" (quoting S. Rep. No. 1097, at 66 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2153)).  Among other things, Title III provides for the suppression of wiretap evidence on the ground that "the order of authorization or approval under which it was intercepted [was] insufficient on its face."  18 U.S.C. § 2518(10)(a)(ii).

Here, the appellant complains that the wiretap orders failed to satisfy Title III's particularity requirements in three respects.  He submits that they did not include "a particular description of the type of communication sought to be intercepted," id. § 2518(4)(c); that they did not include "a statement of the particular offense to which [the communication] relates," id.; and that they did not include a sufficient description of "the agency authorized to intercept the communications," id. § 2518(4)(d).  We examine these plaints sequentially.

The appellant's remonstrance regarding the type of communication sought focuses on the fact that the orders were not limited to existing telephone numbers but, rather, extended to

- 10 -

numbers "subsequently assigned to or used by the instruments bearing the same" electronic serial number (ESN) or International Mobile Equipment Identity (IMEI) number as the original tapped telephone. For example, if Dastinot changed the ten-digit telephone number assigned to a particular cellular telephone, the order would automatically cover the new ten-digit number, and the task force would not have to seek a further order every time that number changed. Relatedly, the orders authorized the interception of "background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use." In the appellant's view, extending the authorizations in this manner rendered them impermissibly broad.

These arguments comprise more cry than wool. Brown's affidavits set forth convincing reasons for tracking telephones by ESN or IMEI number: drug traffickers change telephone numbers frequently in an attempt to avoid detection and, in the bargain, tend not to associate their names with telephone numbers. To cinch the matter, the orders were specific in that they restricted interception to particular serial numbers. We can think of no good reason why Title III's particularity requirement should be read as limiting a wiretap to a specific telephone number rather than a specific ESN or IMEI number reasonably believed to be used by the target. Cf. United States v. Oliva, 705 F.3d 390, 400-01 (9th Cir. 2012) (holding, with respect to 18 U.S.C. § 2581(4)(b),

- 11 -

that order authorizing wiretap by reference to specific serial number was sufficiently descriptive to satisfy Title III's mandate that order describe "the nature and location of the communications facilities").

The appellant's argument regarding background conversations overheard through an off-the-hook telephone is equally unavailing. This language is standard fare in wiretap applications, see id. at 397 n.7, and its inclusion does not make the wiretap orders impermissibly broad. After all, describing potential types of communications to be intercepted appears fully consistent with Title III's directive to define the sought-after communications with particularity. And, finally, it is doubtful whether Title III even applies to background conversations. Cf. United States v. Couser, 732 F.2d 1207, 1210 (4th Cir. 1984) (questioning whether "plain view" doctrine creates an exception to Title III requirements for background conversations). See generally United States v. Williams, 827 F.3d 1134, 1153 (D.C. Cir. 2016) (assuming, arguendo, that overheard conversations implicate Title III's requirement to name target individuals but noting lack of authority for the proposition), cert. denied, 137 S. Ct. 706 (2017).

Next, the appellant posits that the wiretap orders are invalid for failing to identify "the particular offense to which" the sought-after communications relate. 18 U.S.C. § 2518(4)(c).

The critical fault, he says, is that the orders simply cite statutory sections without providing any broader context. But the appellant sets the bar too high: the enumeration of specific criminal statutes itself serves to identify particular offenses and, thus, satisfies this facet of the particularity requirement. See United States v. Spillone, 879 F.2d 514, 517-18 (9th Cir. 1989).

The overall structure of the statute buttresses this view: an earlier subsection — section 2518(3)(a) — uses the term "particular offense" in reference to "a particular offense enumerated in section 2516." Section 2516, in turn, lists criminal offenses, some by statutory citation and others by even broader descriptions, such as "the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States." 18 U.S.C. § 2516(1)(e). In light of this provision, abecedarian principles of statutory construction lead to the conclusion that the "particular offense" requirement in section 2518(4)(c) is satisfied when a wiretap order simply lists the charging statute. See United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4-5 (1st Cir. 1997) ("It is a fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning. This principle . . . operates not only when particular

phrases appear in different sections of the same act, but also when they appear in different paragraphs or sentences of a single section." (citations omitted)).

The appellant has one last shot in his particularity sling. Title III requires a wiretap order to specify "the agency authorized to intercept the communications." 18 U.S.C. § 2518(4)(d). The appellant assails the description of the authorized agency contained in the wiretap orders as virtually "unbounded."

By their terms, the orders authorize "special agents of the United States Drug Enforcement Administration and other investigative and law enforcement officers, and civilian monitors operating under a contract with the Government" to conduct the wiretapping. The appellant correctly notes the looseness of this language: phrases such as "other investigative and law enforcement officers" are not moored to any particular agency. Even so, the orders must be read in the context of Brown's affidavits and the wiretap applications, and those documents leave little doubt that the DEA was the agency involved.

For one thing, Brown's affidavits made pellucid the DEA's pervasive involvement in the case. For another thing, the wiretap orders specified that the wiretapping would "be executed at a listening post maintained at the United States Drug Enforcement Administration Resident Office, in Portland, Maine."

They also described a cooperative effort between Verizon Wireless and the DEA.  Given a practical, commonsense reading, we hold that the wiretap orders were sufficiently particular in describing the DEA as "the agency authorized" to conduct the wiretapping.

Even if we assume, for argument's sake, that inclusion of the loose language challenged by the appellant departed from the statutory "agency identification" requirement, the violation would not demand suppression.  Not every blemish in an order of authorization demands suppression: such a remedy is required only when there is a failure to satisfy "statutory requirements that directly and substantially implement the congressional intention to limit" wiretaps.  United States v. Giordano, 416 U.S. 505, 527 (1974); see United States v. Cunningham, 113 F.3d 289, 293-94 (1st Cir. 1997).  This principle recognizes that suppression is "strong medicine," which should not be profligately dispensed.  United States v. Adams, 740 F.3d 40, 43 (1st Cir. 2014).

The putative violation of the "agency identification" requirement is more a matter of form than of substance.  That lapse, though regrettable, cannot plausibly be said to directly or substantially weaken the protections that Congress sought to craft in connection with wiretapping.  See United States v. López, 300 F.3d 46, 55-56 (1st Cir. 2002) (holding that "government must disclose, as a part of its application for a wiretap warrant, any intention to utilize the services of civilian monitors in the

execution of the warrant" but concluding that omission did not require suppression).  It follows that suppression would be manifestly disproportionate to the putative violation and, thus, should not be required.

That ends this aspect of the matter.  We reject the appellant's importunings and hold that the wiretap orders were not so lacking in particularity as to demand suppression.

## B.  Necessity.

In investigating criminal activity, "wiretapping is to be distinctly the exception — not the rule."  United States v. Hoffman, 832 F.2d 1299, 1307 (1st Cir. 1987).  To balance "privacy and the rights of the individual," Title III requires the government to establish necessity as a prerequisite for obtaining a wiretap order.  Id.  Seizing on this requirement, the appellant asserts that the government failed to establish that it was necessary to resort to wiretapping.

In the Title III lexicon, necessity is not an absolute. Rather, it must be viewed through the lens of what is pragmatic and achievable in the real world.  See United States v. Uribe, 890 F.2d 554, 556 (1st Cir. 1989) (explaining that "Title III demands a practical, commonsense approach to exploration of investigatory avenues").  It is a relative term — and it is context-specific. To demonstrate necessity, a wiretap application must include "a full and complete statement as to whether or not other

- 16 -

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Such a showing "should demonstrate that the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of phone calls." United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006) (quoting Villarman-Oviedo, 325 F.3d at 9).

This does not mean, though, that the government is "required to show that other investigatory methods have been completely unsuccessful." United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002). Nor does it mean that "the government [is] forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." Id.; accord Santana, 342 F.3d at 65.

On appeal, our task is not to undertake a de novo determination of necessity as if we were deciding whether to issue the wiretap order. See United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989); accord Rodrigues, 850 F.3d at 9. We need only "decide if the facts set forth in the application were minimally adequate to support the determination that was made." Ashley, 876 F.2d at 1074 (quoting United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977)). In evaluating whether the government has crossed this threshold, we have not hesitated to

uphold wiretap orders based on an agent's plausible, good faith "assert[ion of] a well-founded belief that the techniques already employed during the course of the investigation had failed to establish the identity of conspirators, sources of drug supply, or the location of drug proceeds."  Rodrigues, 850 F.3d at 10 (collecting cases).  As we explain below, that is exactly the type of assertion that the government proffered here.

Brown's affidavits related that it was not until early 2014 — approximately a year and a half into the investigation — that the government turned to wiretaps.  At that point, the task force already had employed a myriad of investigative techniques, including the use of confidential sources, physical surveillance, controlled buys, analysis of telephone data and public records, and the issuance of subpoenas (both administrative subpoenas and grand jury subpoenas).  Extensive use of these tools had left the agents in the dark about important matters such as the drug ring's sources of supply, its organizational structure, and its finances. By the same token, Brown spelled out plausible reasons for not employing certain other strategies.  The task force did not want to attempt more intensive use of undercover agents or cooperating sources for fear of arousing suspicion.[3]  For much the same reasons,

[3] The maxim "once bitten, twice shy" was in play: Brown was concerned that at least one confidential source already had been outed because the source had been sold fake (or extremely low-quality) heroin in executing a controlled buy.

- 18 -

the task force did not recommend either more aggressive physical surveillance or trying to install cameras. Further surveillance of public spaces would be ineffectual, Brown reasoned, because the vast majority of this drug ring's crimes occurred indoors.

To be sure, the task force had considered simply revealing its evidence, at least in part, to selected coconspirators and attempting to elicit their cooperation. This tactic was not pursued because the task force reasonably concluded that the possibilities of success were slim and the risks of failure were great.

Other methods considered but left by the wayside included cell-site location data and vehicle tracking. Brown plausibly explained that the "range of error" of the cell-site data provided by Verizon Wireless prevented that data from being very useful, "especially in dense places like Boston and Lewiston." At any rate, the data would not be able to "narrow[] down a precise residence" in such areas. With respect to multi-unit buildings (common in Boston and Lewiston), targeting a particular building through location data would not serve to identify individual conspirators. More critically, neither the cell-site data nor vehicle tracking could reveal the purpose for the conspirator's movements, the identity of the persons with whom they were meeting, or the purposes of those meetings. To obtain this kind of intelligence, Brown believed that wiretapping was needed.

The short of it is that Brown's affidavits, read as a whole, show that the task force carried out a long-lasting, wide-ranging, good-faith investigation that ran the gamut of standard investigative techniques. Those affidavits reflect a careful and rational balancing of the utility of various investigatory tools against the possibility of prematurely alerting the drug ring to the probe. The foundation laid in Brown's affidavits substantiates a plausible judgment that the investigation had reached a point at which wiretapping was reasonably necessary. We conclude, therefore, that the wiretap applications were more than minimally adequate to justify the wiretap orders. It follows that the appellant's necessity challenge fails.

## C. Minimization.

Title III warns monitors to minimize irrelevant calls. See 18 U.S.C. § 2518(5) (declaring that monitoring must "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception"); see also Scott v. United States, 436 U.S. 128, 140 (1978) (explaining that Title III "instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of [irrelevant] conversations"). Consistent with this admonition, the wiretap orders directed the monitors to stop listening and/or recording when it became apparent that a conversation was not related to the criminal investigation. The minimization memorandum distributed

- 20 -

to the monitors contained a similar warning.  Even so, the monitors were permitted to check periodically on any given conversation to ascertain whether the discussion had shifted.  The appellant insists that the government failed to comply with these requirements.

Blanket suppression of wiretap evidence is a "drastic" remedy, which should be reserved for the most "egregious" cases. Hoffman, 832 F.2d at 1309.  A minimization violation often can be cured through a less draconian remedy: suppression of only those calls that the court determines should have been minimized.  See id.  Here, however, the appellant has not identified even a single call that he contends should have been minimized, but was not.[4] Thus, the relevant question reduces to whether the government's handling of its minimization responsibilities was so egregious as to support a blanket exclusion of the evidence obtained through wiretapping.

As a general matter, whether the government fails adequately to minimize intercepted conversations "depend[s] on the facts and circumstances of each case."  Scott, 436 U.S. at 140. In evaluating the facts and circumstances of a specific case and

---

[4]  Indeed, the appellant has not identified even a single failure to minimize that prejudiced his rights.  The absence of any such prejudice may, in itself, warrant the denial of his motion to suppress.  See López, 300 F.3d at 58 (upholding denial of suppression where defendant was not prejudiced by two intercepted non-pertinent calls).

the government's fealty to Title III's minimization requirements, a reviewing court must "look at several factors, including: 1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process." López, 300 F.3d at 57.

In this instance, the first two factors weigh heavily in the government's favor. The sprawling operations of the drug ring and the complexity of the suspected crimes are manifest. In cases like this one, involving drug conspiracies of indeterminate proportions, "the need to allow latitude to eavesdroppers is close to its zenith." Hoffman, 832 F.2d at 1308.

To add to the complexity, the appellant and his confederates frequently spoke in Haitian Creole and employed code names on many occasions. The use of "codes and specialized jargon" furnish an added reason for affording monitors leeway because, in such cases, more context is needed to determine whether a conversation is related to the suspected crimes. Uribe, 890 F.2d at 557. The use of a foreign language itself supplies an extra layer of complexity. Cf. United States v. David, 940 F.2d 722, 730 (1st Cir. 1991) (explaining that when intercepted communications are in a foreign language and a real-time translator is not available, minimization may be accomplished as soon as practicable after the fact).

Importantly, the scope of the conspiracy was unknown at the time that the wiretaps were authorized. Indeed, an animating purpose behind the wiretap applications was to flesh out the structure of the organization and to identify the drug ring's sources of supply. These uncertainties also counsel in favor of granting wider latitude to the monitors. See, e.g., Hoffman, 832 F.2d at 1308 (allowing broad latitude when "investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub").

Here, moreover, the thoroughness of the government's precautions to bring about minimization is unquestioned. The record reflects that the government established a regime of adequate precautions designed to ensure that monitors were appropriately minimizing irrelevant conversations. All monitors had to confirm in writing that they had read the wiretap applications and supporting affidavits, the wiretap orders, and an instructional memorandum detailing proper minimization procedures. These documents were posted in the monitors' workplace for easy reference. Prosecutors also met with government agents to brief them on minimization standards.

The third factor is not quite as clear-cut; in the end, though, we think that the record indicates sufficient judicial supervision. See Uribe, 890 F.2d at 558. To begin, the court took care, in crafting the wiretap orders, to detail the

minimization procedures already discussed. In addition, the government was required to submit statistical reports to the court on an ongoing basis.

It is the contents of these statistical reports that bring us to the crux of the appellant's minimization argument. When the appellant questioned the accuracy of some of the proffered numbers in arguing for suppression in the court below — contending, for example, that the reports listed as minimized calls that were not monitored and text messages that were not minimized — the district court ordered the government to submit additional explanations and more detailed data.

Before us, the appellant focuses on the percentage of non-pertinent calls that were not minimized in any way (98%, according to his calculations). Such percentages, though, tell us very little because many calls presumably end before the listener can determine their pertinence. Courts therefore tend to look at the relative percentage of calls minimized out of those calls lasting more than two minutes. See, e.g., United States v. De La Cruz Suarez, 601 F.3d 1202, 1215 (11th Cir. 2010); United States v. Yarbrough, 527 F.3d 1092, 1098 (10th Cir. 2008); United States v. Rivera, 527 F.3d 891, 905 (9th Cir. 2008); United States v. Dumes, 313 F.3d 372, 380 (7th Cir. 2002). Here, the government's data show that there were 1616 such calls, out of which 667 were determined to be not pertinent; 229 calls were minimized, likely

meaning that over two-thirds of non-pertinent calls in excess of two minutes were not minimized.  Although the fact that over 200 calls were minimized shows that there were real minimization efforts undertaken, the percentage of non-pertinent calls not minimized would seem to warrant some explanation.

The record points to such an explanation — at least enough of an explanation for us to find that the district court's ruling was not unreasonable and, thus, to justify upholding it.  As Brown noted, many calls were in Haitian Creole and/or coded parlance, requiring either the use of translators or other assistants.  It is eminently reasonable to conclude that determining the lack of pertinence of such calls would take much longer than usual.

Tellingly, there is no evidence of a slew of examples of calls that plainly should have been minimized in less than two minutes, but were not.  Through we do not suggest that defense counsel need have reviewed hundreds of calls, we make the more limited point that if the minimization process had not been an "honest effort," United States v. Charles, 213 F.3d 10, 22 (1st Cir. 2000), it should have been easy to find quite a few examples of non-minimized calls that obviously should have been minimized. Nor is there any other sign of either a less-than-serious effort on the part of the government to comply or a less-than-serious degree of supervision by the district court such as would lead us

to conclude that the court abused its considerable discretion. Consequently, we decline the appellant's invitation to hold that the failure to minimize more irrelevant calls caused a "taint upon the investigation as a whole."  Hoffman, 832 F.2d at 1307.

Although we uphold the district court's ruling that suppression was not required due to minimization deficiencies, we note that the appellant was at a disadvantage in manipulating the wiretap data.  The government produced the logs for more than 20,000 telephone calls and text messages in the form of 10,000-plus pages in portable document format (PDF).  Converting the 10,000 pages of PDFs into a workable spreadsheet would require inordinate time, effort, and resources.  The government had available to it, and most likely should have produced the data in, a more serviceable format.[5]  The appellant, though, merely mentioned the government's failure to provide the material in an electronically sortable format in his motion to suppress; he did not identify this failure either as a ground for his motion or as

_____

[5] The record discloses that the government was able to run reports, sort, and otherwise manipulate the data using a program called VoiceBox.  When queried at oral argument in this court, the government offered no explanation as to why it could not have produced for the appellant a spreadsheet embodying the same functionality as it enjoyed by means of the VoiceBox program.  But cf. United States v. Briggs, No. 10-CR-184S, 2012 WL 5866574, at *2 (W.D.N.Y. Nov. 16, 2012) (discussing limitations of VoiceBox and finding disclosure obligations satisfied with searchable PDFs rather than Excel-style spreadsheets because of data corruption concerns).

a basis for a continuance. Nor did he raise any issue concerning the government's failure to produce materials in an electronically sortable format in his briefs on appeal. Consequently, we do not pursue this point. See United States v. Iwuala, 789 F.3d 1, 7 (1st Cir. 2015) (explaining that arguments not made in opening appellate brief are deemed waived), cert. denied, 136 S. Ct. 913 (2016); United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) (explaining that arguments not made in the district court are deemed waived).

## III. THE EVIDENTIARY HEARING REQUESTS

We end our journey by examining the appellant's twin requests for evidentiary hearings — his request for a general evidentiary hearing on his failure-to-minimize argument, and a Franks hearing to appraise what he alleges to be false statements in Brown's affidavits. We discuss these hearing requests separately.

### A. General Evidentiary Hearing.

No criminal defendant has "a presumptive right to [a general] evidentiary hearing on a motion to suppress." United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011). Rather, a general evidentiary hearing is only warranted if the party seeking suppression "makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." Id. (quoting United States v.

Staula, 80 F.3d 596, 603 (1st Cir. 1996)). When all is said and done, "the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." Staula, 80 F.3d at 603. "The district court has considerable discretion in determining the need for, and the utility of, evidentiary hearings, and we will reverse the court's denial of an evidentiary hearing in respect to a motion in a criminal case only for manifest abuse of that discretion." Id.

In the case at hand, the appellant alleges that he presented a colorable, fact-intensive claim as to whether the government appropriately minimized his communications. That claim, he says, could only be resolved after an evidentiary hearing. We do not agree.

The district court was adequately apprised of the facts relating to minimization through the parties' filings, particularly after the government furnished supplemental information (at the court's direction) explaining its minimization tallies more thoroughly. The Supreme Court has noted the "necessarily ad hoc nature" of minimization determinations and has emphasized the need for flexibility in judicial oversight. Scott, 436 U.S. at 139. In the end, whether the government has engaged in adequate minimization is quintessentially a judgment call, and the court below had sufficient facts before it to make an informed decision in that regard. We conclude, therefore, that the district

court did not abuse its wide discretion in declining to hold a general evidentiary hearing to delve further into the minimization issue.

## B.  __Franks Hearing.__

This leaves the appellant's request for a __Franks__ hearing.  To obtain a __Franks__ hearing, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."  438 U.S. at 155-56.  "In considering a district court's decision to deny a __Franks__ hearing, we review factual determinations for clear error and the probable cause determination de novo." __United States__ v. __Arias__, 848 F.3d 504, 511 (1st Cir. 2017); see __United States__ v. __Tanguay__, 787 F.3d 44, 48-50 (1st Cir. 2015) (reviewing de novo district court's probable cause analysis in connection with __Franks__ hearing).

Here, the appellant alleges that Brown's affidavits contained false statements with respect to the existence of probable cause vis-à-vis money laundering, the efficacy of cell-site location data, and the likelihood that wiretapping would allow the task force to identify assets of the conspiracy and the precise roles of the individuals involved.

The statements to which the appellant adverts, though, are as much matters of opinion as matters of fact, and the appellant has made no convincing showing that Brown knew the statements were false, yet nonetheless included them in his affidavits.

We add, moreover, that all of the challenged statements appear to have had a reasonable basis in fact. With respect to the money-laundering statements, Brown did not need to have probable cause to believe that the appellant himself was engaging in money laundering. He only needed probable cause to believe that some members of the conspiracy were so engaged. The record adequately evinces that Brown had probable cause to believe that some members of the drug ring were engaging in money laundering; after all, Brown's affidavits presented a detailed showing of repeated buying and selling of drugs, which gave rise to a commonsense inference that the members of the drug ring must have been participating in some kind of scheme to protect and launder their profits.

As to the cell-site location data, the appellant did not proffer enough facts to demonstrate that Brown's statements were false, much less knowingly so. While the appellant's brief relies heavily on a document submitted to the district court (a Verizon Wireless publication for law enforcement officers), the district court took this document into account, see United States v.

Dastinot, No. 2:14-CR-69, 2015 WL 1292611, at *6 (D. Me. Mar. 23, 2015), concluding (reasonably, we think) that it did not contradict Brown's statements that the location data were neither sufficiently accurate nor sufficiently particularized to enable agents to pinpoint a specific residence, especially in densely populated areas.

We need not linger long over the appellant's allegations that Brown either dissembled or made statements in reckless disregard of the truth when he stated that the task force hoped to learn through the wiretaps about the precise roles of conspirators and the whereabouts of the drug ring's assets. In support, the appellant suggests that these goals were too broad to be reasonably achievable. This contention does not withstand scrutiny.

The goals of identifying a drug conspiracy's organizational structure (at least in rough terms) and locating its assets are achievable in some measurable sense. Intercepted conversations might well give clear indications of the drug ring's hierarchy, and investigators — following up on information gleaned from intercepts — might well locate cash, inventory, real estate holdings, or other items of value. To say that these statements of aspirational goals were either intentionally false or made in reckless disregard of the truth is simply a bridge too far. We have approved similarly broad goals in other wiretap cases, see, e.g., Martinez, 452 F.3d at 6; Villarman-Oviedo, 325 F.3d at 10,

and Brown could not be faulted for the description of goals contained in his affidavits.

To say more would be to paint the lily. We hold, without serious question, that the district court did not commit reversible error in refusing to convene either a general evidentiary hearing or a <u>Franks</u> hearing.

## IV. CONCLUSION

We need go no further. For the reasons elucidated above, the orders of the district court are

**<u>Affirmed</u>.**